**VERLINDEN B. V., Plaintiff-Appellant,**

v.

**CENTRAL BANK OF NIGERIA,
Defendant-Appellee.**

No. 643, Docket 80–7413.

United States Court of Appeals,
Second Circuit.

Argued March 6, 1981.

Decided April 16, 1981.

---

Abram Chayes, Cambridge, Mass. (Berthold H. Hoeniger, New York City, of counsel), for plaintiff-appellant.

James G. Simms, New York City (Craig P. Murphy, Peter J. Dranginis, Jr., Kissam, Halpin & Genovese, New York City, of counsel), for defendant-appellee.

Before KAUFMAN and TIMBERS, Circuit Judges, and WARD, District Judge.*

IRVING R. KAUFMAN, Circuit Judge:

Throughout the long summer of 1787, the Framers of the Constitution, assembled at Philadelphia, hammered the parochial prejudices of thirteen colonies into the rough framework of a union. There, a fundamental tenet of American jurisprudence was forged: federal courts are courts of limited jurisdiction. Alexander Hamilton, Luther Martin, James Madison, and others honed such rough verbiage as "cases respecting the national peace and harmony" to the precision of "cases arising under . . . the Laws of the United States,"[1] and Article III, thus tempered, emerged.

Nearly two centuries later, in 1976, Congress passed the Foreign Sovereign Immunities Act ("FSIA" or "Act").[2] The Act purports to create, pursuant to that same Article III, original jurisdiction in the district courts over "any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which

---

* Of the United States District Court for the Southern District of New York, sitting by designation.

1. *See generally* 2 M. Farrand, *The Records of the Federal Convention of 1787*, at 46 (notes of James Madison), 133 (notes of Committee of Detail), 186 (notes of James Madison), 238 (notes of Robert Yates), 576 (notes of Committee of Style), 661 (Constitution) (rev. ed. 1937) (hereinafter "Farrand").

2. Act of October 21, 1976, Pub.L. 94–583, 90 Stat. 2891, *codified at* 28 U.S.C. §§ 1330; 1332(a)(2)—1332(a)(4); 1391(f); 1441(d); and 1602–1611.

the foreign state is not entitled to immunity. . . ." 28 U.S.C. § 1330(a). This case, one of seven decided today involving the FSIA,[3] presents a sharp issue under the Act: may a foreign plaintiff sue a foreign state in a federal court for breach of an agreement not governed by federal law? The language of the statute seems to allow it. After exhaustive examination of the context, language, and history of Article III, we defer to the Framers' prescient restraint, and find jurisdiction lacking in the constitutional sense.

## I.

The facts relevant to the issues on appeal can be stated quite briefly. Verlinden B. V. is a Dutch corporation. It has its principal offices in Amsterdam, the Netherlands. On April 21, 1975, Verlinden signed a contract with the Federal Republic of Nigeria agreeing to ship to Nigeria 240,000 metric tons of cement over the course of several months. Nigeria, in turn, promised to establish "an Irrevocable, Transferable abroad, Divisible and Confirmed Letter of Credit in favour of the seller for the total purchase price through Slavenburg's Bank, Amsterdam,

Netherlands." On June 23, 1975, Nigeria established the letter of credit at the Central Bank of Nigeria,[4] and made it payable through the Morgan Guaranty Trust Company in New York. Under the letter of credit, Verlinden could collect, upon presentation of certain documents, $60 per ton for shipments made to Nigeria. The letter of credit provided it was to be governed by "[U]niform [C]ustoms and Practice Documentary Credits (1962 Revision) Chamber of Commerce Brochure No. 222."[5]

On August 21, 1975, Verlinden subcontracted with a third party, Interbuco (a Leichtenstein corporation), for the purchase of 240,000 tons of cement at $51 per ton. Verlinden agreed to pay Interbuco $5 per ton if Verlinden reneged on the purchase.

In September, Nigeria found its ports clogged with ships.[6] Central Bank instructed Morgan, and Morgan notified Verlinden, that Morgan was not to pay Verlinden under the letter of credit for a shipment of cement unless Verlinden had obtained, two months before sailing, Nigeria's permission to enter the port. Verlinden, alleging Central Bank's action constituted an anticipatory breach of the letter of credit,[7] sued Cen-

---

**3.** The other six are *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300 (2d Cir. 1981); *Decor by Nikkei International, Inc. v. Federal Republic of Nigeria*, 647 F.2d 300 (2d Cir. 1981); *Chenax Majesty, Inc. v. Federal Republic of Nigeria*, 647 F.2d 300 (2d Cir. 1981); *East Europe Import-Export, Inc. v. Federal Republic of Nigeria*, 647 F.2d 300 (2d Cir. 1981); *Reale International, Inc. v. Federal Republic of Nigeria*, 647 F.2d 330 (2d Cir. 1981); and *Gemini Shipping, Inc. v. Foreign Trade Organization for Chemicals and Foodstuffs*, 647 F.2d 317 (2d Cir. 1981).

**4.** The Central Bank of Nigeria is an instrumentality of the Federal Republic of Nigeria. It performs functions similar to the United States Federal Reserve and the Bank of England.

**5.** The Uniform Customs and Practice for Documentary Credits (1962 Revision) Chamber of Commerce Brochure No. 222 ("UCP") is a document setting forth standards of conduct relating to letters of credit. It is published by the International Chamber of Commerce, which has its headquarters in Paris.

**6.** Nigeria's cement contract with Verlinden was one of 109 such contracts Nigeria entered in 1975. The details of this massive program for the purchase of cement, the port congestion it caused, and the litigation that ensued are described more fully in *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, *supra* note 3, decided this day.

**7.** Article 3 of the Uniform Customs and Practice for Documentary Credits of the International Chamber of Commerce provides:

An irrevocable credit is a definite undertaking on the part of an issuing bank and constitutes the engagement of that bank to the beneficiary or, as the case may be, to the beneficiary and bona fide holders of drafts drawn and/or documents presented thereunder, that the provisions for payment, acceptance or negotiation contained in the credit will be duly fulfilled, provided that all the terms and conditions of the credit are complied with. . . . Such undertakings can neither be modified nor cancelled without the agreement of all concerned.

Central Bank does not seriously dispute that its instructions to Morgan violated the UCP.

tral Bank in the Southern District of New York. Verlinden's complaint claimed $4.66 million, consisting mostly of lost profits and of money Verlinden was forced to pay Interbuco under the terms of the subcontract. Central Bank moved to dismiss the complaint for lack of jurisdiction under the FSIA. The district court, 498 F.Supp. 1284, granted the motion, assuming, as we have in setting forth the facts above, all the allegations of Verlinden's complaint to be true. Verlinden appeals.

## II.

Turning to the law, our first inquiry must be whether Verlinden's complaint meets a threshold requirement under the FSIA. Do both Verlinden and Central Bank fall into the category of parties contemplated by the Act? Section 2(a) of the FSIA, *codified at* 28 U.S.C. § 1330(a), provides:

> The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

**8.** *See also* Senate Judiciary Committee, *Define Jurisdiction of U.S. Courts in Suits Against Foreign States*, S.Rep.No. 1310, 94th Cong., 2d Sess. 8. The House and Senate Committees filed identical reports, and reference *infra* to the House Report may be deemed to represent the views of the Senate Committee as well.

**9.** *Hearings on H.R. 11315 before the Subcommittee on Administrative Law and Governmental Relations of the Committee on the Judiciary,* House of Representatives, 94th Cong., 2d Sess. 24 (1976) *("1976 Hearings")* (testimony of Monroe Leigh, Legal Adviser, Dep't of State). President Ford, in signing the bill into law, stated that the Act's provisions were "available to all American citizens." 12 Weekly Comp. of Pres.Docs. 1554 (1976).

**10.** *1976 Hearings* at 80 (testimony of Bruno A. Ristau, Chief, Foreign Litigation Section, Civil Division, Dep't of Justice).

**11.** *1976 Hearings* at 80 (testimony of Cecil J. Olmstead, Chairman, The Rule of Law Committee).

The parties agree that Central Bank is an "instrumentality of a foreign state" under 28 U.S.C. § 1603(b), and therefore is a "foreign state" under § 1603(a). Accordingly, Verlinden's suit is one "against a foreign state" for purposes of § 1330(a).

Verlinden's qualification under the Act is less clear, since it is a foreign corporation. The Report of the House Judiciary Committee on the bill that later became the Act (H.R. 11315) proclaims the Act's purpose to be to ensure that *"our citizens* will have access to the courts" in suits against foreign states. House Judiciary Committee, *Jurisdiction of United States Courts in Suits Against Foreign States*, H.R.Rep.No. 1487, 94th Cong., 2d Sess. 6, *reprinted in* [1976] U.S.Code Cong. & Admin.News 6604, 6605 *("House Report")* (emphasis added).[8] The draftsmen of § 1330(a) assumed "U.S. businessmen" and "American property owner[s]" would bring suits under the Act. *Id.* The experts who testified at subcommittee hearings spoke of protecting "American citizens,"[9] "American businesses,"[10] "American parties,"[11] and "American nationals."[12] Looking back to the hearings surrounding the introduction of a 1973 predecessor to H.R. 11315, references to "our citizens" again abound.[13] In general, Congress emphasized that it did not intend "to open up

**12.** *1976 Hearings* at 100 (statement of Charles N. Brower, Yale Law School).

**13.** *Hearings on H.R. 3493 before Subcommittee on Claims and Governmental Relations of the Committee on the Judiciary,* 93d Cong., 1st Sess. 18 (1973). *("1973 Hearings")* (testimony of Charles N. Brower, Legal Adviser, Dep't of State). The 1973 bill was introduced as S. 566, 93d Cong., 1st Sess., *see* 119 Cong.Rec. 2204 (1973), and H.R. 3493, 93d Cong., 1st Sess., *see id.* at 2880. The language of § 2 of those bills is identical in material respects to the text of the present 28 U.S.C. § 1330(a). *See, e. g.,* 119 Cong.Rec. 2213–15 (1973) (reprinting S. 566). The 1973 bills were withdrawn by their sponsors, and introduced as revised in H.R. 11315, 94th Cong., 1st Sess., *see* 121 Cong.Rec. 42017 (1975), and S. 3553, 94th Cong., 2d Sess., *see* 122 Cong.Rec. 17454 (1976). H.R. 11315 became the FSIA.

our courts to all comers to litigate any dispute which any private party may have with a foreign state anywhere in the world." *Hearings on H.R. 11315 Before the Subcommittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary,* 94th Cong., 2d Sess. 31 (1976) *("1976 Hearings")* (testimony of Bruno A. Ristau, Chief, Foreign Litigation Section, Civil Division, Dep't of Justice).

On the other hand, extensive language in the legislative history supports the belief that Congress did not limit the Act to suits brought by Americans. The House Report states the Act provides "when and how *parties*" can sue a foreign state in American courts, *House Report* at 6604 (emphasis added), and that it applies to "any claim" against a foreign state, *id.* at 6611. Testimony before the subcommittee at the 1976 hearings referred broadly to relief for "private parties with claims," *1976 Hearings* at 31 (testimony of Bruno A. Ristau), and "private litigants," *id.* at 58 (testimony of Peter D. Trooboff, Chairman, Committee on Transnational Judicial Procedure, International Law Section, American Bar Association). Professor Moore finds a "plain intention ... to confer on the district court jurisdiction of an action by an alien against a foreign state if the action otherwise meets the requirements" of the Act. 1 J. Moore, *Federal Practice and Procedure* ¶ 0.66[4] at 700.178–79 (2d ed. 1979). This conclusion is buttressed by the Act's removal provision, 28 U.S.C. § 1441(d), which is not limited to suits brought by U.S. citizens, and purports to allow removal to federal court of "*any* civil action brought in a State court against a foreign state" (emphasis added).

■ From this murky and confused legislative history, only one conclusion emerges:

Congress formed no clear intent as to the citizenship of plaintiffs under the Act. It probably did not even consider the question. In the absence of determinative—or even persuasive—guidance from the legislative history, the words of the statute control. Section 1330(a) is not limited to suits brought by Americans. It applies to "*any* nonjury civil action against a foreign state*" (emphasis added). Accordingly, we hold that a suit brought in a federal court by an alien against a foreign state is properly filed—at least under the terms of the Act.

### III.

Having concluded that both plaintiff and defendant are within the class of parties contemplated by § 1330(a), we are forced to confront the constitutional dilemma: does Congress possess the power to grant jurisdiction over a suit such as this?

■ Article III of the federal Constitution provides that the national government's "judicial Power shall extend to" certain types of disputes, which it lists in clause 1 of section 2.[14] That Congressional power to confer jurisdiction to those cases and no further has been established on a number of occasions. *E. g., Hodgson v. Bowerbank,* 9 U.S. (5 Cranch) 303, 3 L.Ed. 108 (1809). *See also National Mutual Insurance Co. v. Tidewater Transfer Co.,* 337 U.S. 582, 604, 69 S.Ct. 1173, 1183, 93 L.Ed. 1556 (Rutledge and Murphy, *JJ., concurring*); 626, 69 S.Ct. 1195 (Vinson and Douglas, *JJ., dissenting*); 646, 69 S.Ct. 1209 (Frankfurter and Reed, *JJ., dissenting*); *Federal Election Commission v. Central Long Island Tax Reform Immediately Committee,* 616 F.2d 45, 51 (2d Cir. 1980) *(per curiam) (en banc).* To satisfy federal jurisdictional requirements, therefore, every case must be supported by both a Congres-

---

14. The clause provides in full:

The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State; —between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

sional grant of jurisdiction [15] and a constitutional base on which the statute rests. *Kline v. Burke Construction Co.*, 260 U.S. 226, 234, 43 S.Ct. 79, 82, 67 L.Ed. 226 (1922). The legislative diversity grant, for example, 28 U.S.C. § 1332, stands squarely on similar words in Article III. The statutory federal question grant also tracks the constitutional phrase. 28 U.S.C. § 1331. Section 1330 can claim no such parallel language for support, and must seek it among the finite—and incongruent—words of Article III.

### A.

■ The search for a constitutional basis for a § 1330 suit between two aliens brings us first, but only briefly, to Article III's diversity grant. It provides, *inter alia*, that the judicial power shall extend to "Controversies ... between a State, the Citizens thereof, and foreign States, Citizens or Subjects." The phrase nowhere mentions a case between two aliens. Accordingly, Congress is powerless to confer jurisdiction over such suits, at least on the basis of the diversity grant,[16] *Hodgson v. Bowerbank, supra*, 9 U.S. at 303, 3 L.Ed. 108; *Montalet v. Murray*, 8 U.S. (4 Cranch) 46, 2 L.Ed. 545 (1807),[17] and Verlinden must look elsewhere in Article III for language to support its suit.

### B.

A more colorable—but still unsuccessful—constitutional grounding for Verlinden's FSIA suit is the very first phrase of the relevant clause of Article III. That phrase extends the judicial power to "all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; ..." The federal courts have had little opportunity to construe the crucial language of the phrase, "arising under ... the Laws of the United States," mainly because the passage in 1875 of the predecessor to § 1331 made direct resort to the Constitution unnecessary. A huge body of law interprets the statute. It is, therefore, to the almost identical words in § 1331—"arises under the ... laws ... of the United States"—to which we first turn in exploring whether Verlinden's suit "arises under" federal law for purposes of Article III.

### 1.

■ We had occasion in *T. B. Harms Co. v. Eliscu*, 339 F.2d 823 (2d Cir. 1964), *cert. denied*, 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965), a copyright case, to discuss the three species of suit found to exist within the realm of § 1331. The first type finds its source in *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260, 36 S.Ct. 585, 586, 60 L.Ed. 987 (1916), in which Mr. Justice Holmes stated that "a suit arises under the law that creates the cause of action." Five years later in *Smith v.*

---

**15.** *See Ex parte Edelstein*, 30 F.2d 636 (2d Cir.) (L. Hand, J.), *cert. denied*, 279 U.S. 851, 49 S.Ct. 347, 73 L.Ed. 994 (1929).

**16.** *Cf.* 28 U.S.C. § 1350, conferring jurisdiction over suits "by an alien for a tort only, committed in violation of the law of Nations." Section 1350 permits suits between aliens through the federal question grant of Article III. *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980). So do, *inter alia*, the securities laws and antitrust laws, again operating through the federal question grant. *IIT v. Vencap, Ltd.*, 519 F.2d 1001 (2d Cir. 1975) (securities laws); *Joseph Muller Corp. Zurich v. Societe Anonyme de Gerance et D'Armement*, 451 F.2d 727 (2d Cir. 1971), *cert. denied*, 406 U.S. 906, 92 S.Ct. 1609, 31 L.Ed.2d 816 (1972) (antitrust laws).·

We stated in *Filartiga* that physical torture violates the law of nations, and thereby transgresses the "laws of the United States." 630

F.2d at 888. We have elsewhere held that commercial violations, such as those here alleged, do not constitute breaches of international law. *See Dreyfus v. von Finck*, 534 F.2d 24, 30–31 (2d Cir.), *cert. denied*, 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976); *IIT v. Vencap, Ltd., supra*, 519 F.2d at 1015.

**17.** At least, Congress is powerless to confer jurisdiction when, as here, the suit contains aliens only. If the case were between an alien and an American on one side and an alien on the other, diversity jurisdiction would not exist under § 1332, *IIT v. Vencap, Ltd., supra* note 16, 519 F.2d at 1015, but it might be available to Congress under Article III. *Compare State Farm Fire & Casualty Co. v. Tashire*, 386 U.S. 523, 87 S.Ct. 1199, 18 L.Ed.2d 270 (1967), *with Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806).

*Kansas City Title & Trust Co.*, 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577 (1921), the Supreme Court found the Holmes test too restrictive, and added a second genus of suit to § 1331: those in which the plaintiff's complaint discloses a need to interpret a federal law.[18]  *Accord, Ivy Broadcasting Co. v. American Telephone & Telegraph Co.*, 391 F.2d 486, 492 (2d Cir. 1968).  The third grouping is typified by *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943).  It imposes a "federal common law" upon cases in which the court finds a national interest so strong that a judge-made federal rule of decision preempts the state law that would otherwise govern the cause.

Verlinden's suit against Nigeria falls into none of the three categories.  Its inclusion in the first group, suits in which federal law "creates the cause of action," is precluded by 28 U.S.C. § 1606.  That section provides that, in FSIA suits, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances."  There is no intent here to create new federal causes of action; the purpose of the Act instead is to provide "*access* to the courts in order to resolve ordinary legal disputes."  *House Report* at 6605 (emphasis added).  The House Report states flatly: "The bill is not intended to affect the substantive law of liability."  *Id.* at 6610.[19]  Indeed, the parties agree that the law governing Verlinden's suit for breach of the letter of credit is the Uniform Customs and Practice for Documentary Credits of the International Chamber of

Commerce, or the law of New York.  At any rate, it is not federal.  Congress here intended to "create" no cause of action, and Holmes's test is not satisfied.  *Cf. Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); *Schumacher v. Beeler*, 293 U.S. 367, 55 S.Ct. 230, 79 L.Ed. 433 (1934).  Nor is the third test, for the progeny of *Clearfield Trust* have required a federal interest strong enough to supplant state rules of decision.  *See, e. g., Miree v. DeKalb County*, 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *In re "Agent Orange" Product Liability Litigation*, 635 F.2d 987 (2d Cir. 1980).

Appellant's contentions focus on the second, broader test.  Its application depends upon the exact language of *Ivy Broadcasting*: whether "the complaint discloses a need for the interpretation of an act of Congress."  Undoubtedly the FSIA, an act of Congress, will be construed if Verlinden's suit is permitted beyond the courthouse door.  Delicate questions of sovereign immunity, which Congress in the Act made wholly federal, *see House Report* at 6610, will be the fulcrum of considerable controversy.  If decided adversely to plaintiff, as they were by Judge Weinfeld, they will determine the outcome of the litigation.

◼  Despite all this, the issue of sovereign immunity is not disclosed by Verlinden's well-pleaded complaint.  That complaint alleges the breach of a letter of credit, *simpliciter*.  The Act retains sovereign immunity as a defense, to be raised by the defendant.[20]  Defenses that have to be

---

18.  In *Smith*, the cause of action was created by state law; a shareholder sued to enjoin his corporation's purchase of bonds, which purchase the shareholder considered unauthorized by the corporation's charter.  State law created the charter.  But the ground on which the shareholder alleged the purchase to be improper—that the federal instrumentality which had issued them had done so unconstitutionally—clearly called for the interpretation of a federal law.

   Justice Holmes dissented.

19.  That is, "whether state or federal law is to be applied will depend on the nature of the issue before the court," not the presence of a foreign state.  "Under the *Erie* doctrine state

substantive law, including choice of law rules, will be applied if the issue before the court is non-federal."  *1973 Hearings* at 47 (Dep't of State, Section-by-Section Analysis of 1973 bill).  *Accord, House Report* at 6621.

20.  *House Report* at 6616 ("sovereign immunity is an affirmative defense which must be specially pleaded"; "the burden will remain on the foreign state").  *Accord, 1976 Hearings* at 74 (statement of Committee on International Law of the Association of the Bar of the City of New York); *id.* at 81 (testimony of Cecil J. Olmstead).  *See also 1973 Hearings* at 32 (testimony of Charles N. Brower) ("it is incumbent upon the defendant to raise the defense of

raised affirmatively, no matter how urgent their federal nature, do not confer jurisdiction. *Louisville & Nashville Railroad Co. v. Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908). *See also Phillips Petroleum Co. v. Texaco, Inc.*, 415 U.S. 125, 94 S.Ct. 1002, 39 L.Ed.2d 209 (1974) (*per curiam*); *Tennessee v. Union & Planters' Bank*, 152 U.S. 454, 14 S.Ct. 654, 38 L.Ed. 511 (1894). The distinction is perhaps best illustrated by *Gully v. First National Bank in Meridian*, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936), in which a federal statute removed the national bank's immunity from state taxation. Speaking for a unanimous court, Mr. Justice Cardozo stated: "A suit does not arise under a law renouncing a defense, though the result of the renunciation is an extension of the area of legislative power which will cause the suitor to prevail." *Id.* at 116, 57 S.Ct. at 99. *See generally* P. Bator, P. Mishkin, D. Shapiro, H. Wechsler, *Hart & Wechsler's The Federal Courts and the Federal System* 883–90 (2d ed. 1973).

Moreover, the type of statute to be interpreted here is qualitatively different from the statutes involved in *Smith* and its progeny. Federal jurisdiction was present in those cases because the complaint revealed the need to construe a statute conferring substantive rights: in *Smith,* the Federal Farm Loan Act (creating the Federal Land Banks) and Article I, § 8, cl. 18 of the Constitution (granting to Congress the right to make all laws necessary and proper to execute its powers); in *Ivy Broadcasting,* federal common law regarding the duties of communications carriers. *Accord, Empresa Hondurena de Vapores, S.A. v. McLeod,* 300 F.2d 222 (2d Cir. 1962) (statute creating right to petition for labor representation elections), *vacated on other grounds,* 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963). While in none of those cases did a federal law create the cause of action, each suit required construction of a law which, in

another posture, had the power to do so. The laws regulated conduct and created rights outside the courtroom. This suit, *per contra*, requires construction of a federal statute, but only one regulating judicial practice. One cannot sue for violation of the FSIA. Accordingly, this case is closer to decisions like *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950). *Skelly Oil* called squarely for the interpretation of a federal statute (the Declaratory Judgment Act, 28 U.S.C. § 2201), yet the Supreme Court found jurisdiction lacking. Speaking for the Court, Mr. Justice Frankfurter explained that "the right to be vindicated was State-created," 339 U.S. at 673, 70 S.Ct. at 879, not a right "arising under" federal law. That the conduit of jurisdiction was a federal statute did not create jurisdiction over the claim where none existed before. The same is true here. *See also Moore v. Chesapeake & Ohio Railway Co.*, 291 U.S. 205, 54 S.Ct. 402, 78 L.Ed. 755 (1934).

2.

Having established that Verlinden's suit does not "arise under" federal law by principles developed in cases construing § 1331, the issue before us is this: is the meaning to be given to the words "arising under" in Article III sufficiently broader than their construction in § 1331 to bring Verlinden's suit within the federal judicial power? We think not, but we refuse to resolve this difficult case on the simple ground of logomachy. "The substantial identity of the words does not ... require, on that score alone, an identical interpretation. The differences in the functions of the two enactments, in the circumstances surrounding their adoption and in their further provisions justify inquiry as to whether their meaning is different." Shulman & Jaegerman, *Some Jurisdictional Limitations on Federal Procedure,* 45 Yale L.J. 393, 405 n. 47 (1936). The Supreme Court has implied,

---

sovereign immunity rather than the plaintiff being required to establish lack of immunity").

Some confusion on this point arises from § 1604, which is drafted to create a general principle of immunity, not a presumption of amenability which defendant must overcome.

The reasons for this aspect of the Act's structure are historical. *1973 Hearings* at 32 (testimony of Charles N. Brower and Bruno A. Ristau). The above citations establish that the "negative drafting" was not intended to revise the rules of pleading.

but has never held, that § 1331 occupies less than all of the ground staked out by the parallel phrase in Article III. *Shoshone Mining Co. v. Rutter*, 177 U.S. 505, 506, 20 S.Ct. 726, 44 L.Ed. 864 (1900).[21] The question before us is whether this case can stand on the narrow strip that remains.

The clearest statement of the Framers' intent concerning Article III of the Constitution comes from Alexander Hamilton, a delegate from New York. In *The Federalist*, No. 83, Hamilton wrote:

> The judicial authority of the federal judicatures is declared by the Constitution to comprehend certain cases particularly specified. The expression of those cases marks the precise limits, beyond which the federal courts cannot extend their jurisdiction, because the objects of their cognizance being enumerated, the specification would be nugatory if it did not exclude all ideas of more extensive authority.

A. Hamilton, *The Federalist*, No. 83, at 519 (Putnam ed. 1888). In other words, the Framers emphatically did not intend to grant the legislature power to create jurisdiction over any cases Congress chose. Congressional prerogative in this area is circumscribed.

The first test of that Congressional power grew out of the Judiciary Act of 1789, ch. 20, 1 Stat. 73 (1789). In § 11 of that Act, Congress purported to confer on the district courts jurisdiction over any case "where . . . an alien is a party." In *Mossman v. Higginson*, 4 U.S. (4 Dall.) 12, 1 L.Ed. 720

(1800), however, the Supreme Court found that the judicial power did not extend to a suit between two aliens, even where the statute conferred it.[22] *Accord, Hodgson v. Bowerbank, supra.* The Court in *Mossman* discussed the diversity clause of Article III, and found jurisdiction lacking for the reason set forth in section III–A, *supra.* The Court did not discuss, but by its holding passed upon, the "arising under" clause as well. Since judicial power was found wanting in the constitutional sense, the Court necessarily held that a suit brought under § 11 did not "arise under" a law of the United States for purposes of Article III. That is, the Supreme Court in *Mossman v. Higginson* decided that, despite a federal interest in suits involving aliens,[23] Congress by the mere act of passing a statute conferring jurisdiction over a class of suits did not bring those suits within the judicial power. The reason is clear: to allow Congress to do so places no limits on the judicial power at all, and a *sine qua non* of constitutional analysis instructs that this power is limited.

■ *Mossman* greatly advances our inquiry. Congress in the FSIA has purported to create jurisdiction over not cases "where an alien is a party," but cases "against a foreign state." In the absence of substantive rules of decision, we are constrained to find that the judicial power does not extend this far. *See Textile Workers Union v. Lincoln Mills, supra* (Frankfurter, J., *dissenting*).[24]

Looking beyond this sort of detailed and mechanical application of old holdings to

---

**21.** A simpler, but less germane, example of this is the erstwhile presence of a jurisdictional amount requirement in most federal question cases. 28 U.S.C. § 1331(a). *See* Federal Question Jurisdictional Amendments Act of 1980, Pub.L. 96–486 (to be codified in 28 U.S.C. § 1331), eliminating the requirement.

**22.** The Court in *Mossman* did not void § 11 insofar as it applied to such suits, since *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), and the power to strike down statutes, still lay in the future. Instead, the Court construed § 11 to require that a citizen of a state be on at least one side of the dispute.

**23.** That aliens were a subject of predominant—indeed, preemptive—federal concern was assumed by the Framers. *See Filartiga v. Pena-*

*Irala, supra* note 16, 630 F.2d at 877–78. In fact, early drafts of Article III had included references to "all cases in which foreigners may be interested." *E. g.*, 1 Farrand 244 (notes of James Madison). *See also id.* at 247 (notes of Rufus King).

**24.** Beyond *Mossman* and *Hodgson*, the latter case of *The Propeller Genessee Chief v. Fitzhugh*, 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1852), provides support. Congress in the Great Lakes Act of 1845 had purported to create jurisdiction over cases "concerning" vessels on the Great Lakes, without changing the substantive rule of decision in those cases. 53 U.S. at 451–52, 13 L.Ed. 1058. The Supreme Court, in an opinion by Chief Justice Taney, upheld the law on maritime grounds, but stated

new facts, it becomes evident that our decision here is compelled by broader principles. The Framers created federal courts to protect, first, rights secured by the Constitution, and, second, rights created by federal law. They were concerned with the enforcement of uniformity in the interpretation of federal laws, but only insofar as those federal laws regulated conduct. We turn once more to Hamilton, writing in *The Federalist*, No. 80, *supra*, at 495. He stated: "Thirteen independent courts of final jurisdiction over the same causes, arising upon the same laws, is a hydra in government, from which nothing but contradiction and confusion can proceed." Significantly, his concern for uniformity extended only to "causes," not to all federal laws. Accordingly, when *Mossman* was *sub judice*, the Supreme Court did not hold that the need for a uniform standard under which aliens might be sued in federal court created, *ipso facto*, federal jurisdiction. The need to develop such a *uniform standard* (through, perhaps, construction of the term "alien") did not implicate a federal "cause," and was therefore insufficient. Here, the asserted need for a uniform standard under which foreign states might be sued in American courts must fail for the same reason.

█ Thinking even more broadly, our result is required by the very structure of Article III, § 2, cl. 1. That clause lists, in sequence, nine types of cases to which the judicial power extends. *See* note 14, *supra*. If we accepted the interpretation of the first phrase necessary to find jurisdiction here—that a case can "arise under" a jurisdictional statute—then we could eliminate the other eight phrases from the clause. For example, if we decided that Verlinden's

suit was one "arising under a law of the United States" because it was brought under § 1330, then we could similarly hold that a suit "arose under a law of the United States" because it was brought under § 1332. The constitutional diversity grant would then be surplusage. If we are not to read the other phrases out of the clause, we must restrict the first phrase to cases arising under a substantive law.

Granted the above, we cannot be deterred by *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824). *Osborn* contains dictum, made holding in *Bank of the United States v. Planters' Bank of Georgia, id.* at 904 (1824), that a suit brought by the Bank of the United States could "arise under" the statute creating the Bank and giving it the right to sue and be sued. The facts of the case merit examination, for it has been suggested,[25] and we believe, that the case should be limited to them. Shortly before *Osborn*, the Bank of the United States had won, with great difficulty, the right to exist and to be free of state taxes. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819). Ohio continued to tax the Bank, and forcibly removed money from the Bank's vaults to satisfy the levy. In *Osborn*, the Bank sued to enjoin collection of the tax. The Supreme Court, faced with the death of the bank and of its holding in *McCulloch* on the one hand and with stretching jurisdictional concepts on the other, saved the Bank. A fair reading of the case depends heavily on the presence of an instrumentality of the United States as a party, and on the national government's desire to protect the Bank and itself from the rapacious states. The Court twenty-eight years later did not ex-

flatly that the jurisdictional provision would be unconstitutional if it were based only on the "arising under" grant and if it were unsupported by substantive regulations. *Id.* at 453, 13 L.Ed. 1058. That is, a case brought under the jurisdictional provision would not "arise under" a law of the United States for purposes of Article III.

The conclusion to be gleaned from these canescent cases is this: the *Ivy Broadcasting* rule, requiring as a condition of jurisdiction the interpretation of a federal substantive law, *i. e.*, one which regulates conduct outside the court-

room, is of constitutional moment. We need not here hold whether the other aspect of the rule under § 1331 (that the necessity to interpret the federal law be disclosed by the complaint) is constitutionally required. *Louisville & Nashville Railroad Co. v. Mottley (Mottley II)*, 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297 (1911), implies it is not.

25. E. g., *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 481, 77 S.Ct. 912, 934, 1 L.Ed.2d 972 (1957) (Frankfurter, J., *dissenting*).

tend *Osborn*'s holding to cases where the United States was not a party, *The Propeller Genessee Chief v. Fitzhugh,* 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1852),[26] and we decline to do so here. *See generally,* Mishkin, *The Federal "Question" in the District Courts,* 53 Colum.L.Rev. 157, 160–63, 184–96 (1953).

### IV.

In interpreting the Constitution, we discern the Framers' intent only as seen through a glass, darkly, if at all. The delegates to the Constitutional Convention did not agree on all the Constitution's provisions, even as they signed it. Accordingly, a court construing its language must look as much to history, good sense, and sound concepts of judicial administration as to the text itself. Considering, therefore, both the past and the present, we find federal courts to be without power to hear suits such as the one before us.

The judgment is affirmed, on the ground that the court lacks subject matter jurisdiction over the controversy.

**26.** *Osborn* was extended to cases involving federally-chartered corporations, *see The Pacific Railroad Removal Cases,* 115 U.S. 1, 29 L.Ed. 319 (1885), but that holding has been called a "sport," Mishkin, *The Federal "Question" in* the District Courts, 53 Colum.L.Rev. 157, 160 n.24 (1953), and has been limited to its facts. *See Textile Workers Union v. Lincoln Mills, supra* note 25, 353 U.S. at 481, 77 S.Ct. at 934 (Frankfurter, J., *dissenting*).