**Kianoosh JAFARI, et al., Plaintiffs,**

v.

**ISLAMIC REPUBLIC OF IRAN, Defendant.**

**No. 81 C 4043.**

United States District Court, N. D. Illinois, E. D.

April 23, 1982.

Eugene P. Thomas, Jr., Schwartzberg, Barnett & Cohen, Chicago, Ill., for plaintiffs.

Donald C. Shine, Nisen Elliott & Meier, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

One former and three present Iranian nationals living in the United States have sued the current government of Iran ("Iran") to recover money owed them for what they claim was wrongful expropriation of their property in Iran. Kianoosh Jafari ("Kianoosh") became a United States citizen March 17, 1981 (after the seizure but before filing this suit), while Javad Jafari ("Javad"), Ashraf Olhajieh Solemaini ("Ashraf") and Nooshin Jafari ("Nooshin") are still aliens.

Iran has moved to dismiss the action for want of subject matter jurisdiction. This Court agrees that (for differing reasons depending on plaintiffs' differing citizenship) it has no jurisdiction over any of the claims, and it therefore grants Iran's motion to dismiss.

### Facts[1]

Kianoosh and Javad own a building in Tehran that houses the Andisheh Now School. In 1966 Iran took the school and thereafter paid about $1,300 a month for rental of the building and the use of the school's name. About November 1979 the current Iranian government stopped making payments. Complaint Count I seeks recovery for the resulting expropriation of property.

Count II concerns Ashraf's ownership of a building in Tehran, one floor of which she had rented before 1979 for $1,300 a month. During that year Iran took the building

---

1. As always, the well-pleaded allegations of the Complaint (in this case the Amended Complaint) are taken as true on this motion to dismiss.

without providing compensation, dismissed Ashraf's tenant, seized the building's furniture (owned by Ashraf) and "took possession of all rent owed to that date." Complaint Counts III–V assert Ashraf's other claims—that Iran refuses to pay money due her through her ownership of certain government bonds and a $12,000 Iranian bank deposit and for her rights to a salary as a "medical school employee" on leave of absence.

Count VI is Nooshin's claim for $100,000 based on a promise by Iran in exchange for Nooshin's "surrender" of her (unspecified) position. Count VII states Kianoosh's claim for a $70,000 pension owed him for his service in the Iranian public schools from 1962 to 1968. Count VIII is Javad's claim for a retirement salary due from Iran, which he claims has not been paid since November 1979.

### Claims by Kianoosh

■ Despite his present United States citizenship, Kianoosh cannot rely on the legislative diversity grant, 28 U.S.C. § 1332, as a source of federal court jurisdiction. True enough, the *constitutional* diversity grant of Article III extends to "Controversies . . . between a State, the Citizens thereof, and foreign States, Citizens or Subjects." But Sections 1332(a)(2) and (4) make plain that Congress has not extended federal judicial power to its full permissible reach under Article III, for the legislative provisions vest jurisdiction only over civil actions between (emphasis added):

(a) citizens of a State and *citizens or subjects* of a foreign state;

\*    \*    \*    \*    \*    \*

(4) a foreign state . . . as *plaintiff* and citizens of a State. . . .

This action by a domestic citizen (Kianoosh) as *plaintiff* against a foreign state itself (Iran) as *defendant* fits neither category.

Thus Kianoosh must look instead to the portion of the Foreign Sovereign Immunities Act (the "Act," Pub.L. 94–583, 90 Stat. 2891) embodied in 28 U.S.C. § 1330(a):

The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

In that respect he seeks to invoke 28 U.S.C. §§ 1605(a)(1) and (3). Such reliance seems clearly ill-founded:

(1) Section 1605(a)(1) withdraws immunity if "the foreign state has waived its immunity either explicitly or by implication. . . ." Iran has not done that, for its August 15, 1955 Treaty of Amity, Economic Relations and Consular Rights with the United States does not so provide. Only one immunity section (Art. XI, ¶ 4) is contained in the Treaty (emphasis added):

No *enterprise of either High Contracting Party*, including corporations, associations, and government agencies and instrumentalities, which is publicly owned or controlled shall, if it engages in commercial, industrial, shipping or other business activities within the territories of the other High Contracting Party, claim or enjoy, either for itself or for its property, immunity therein from taxation, suit, execution of judgment or other liability to which privately owned and controlled enterprises are subject therein.

That waiver of immunity of *enterprises* of the High Contracting Party should not fairly be read to state or imply a like waiver as to the High Contracting Party (Iran) itself. That would do violence to the language of the Treaty and of Section 1605(a)(1).

(2) Section 1605(a)(3) withdraws immunity if property rights are taken in violation of international law and the seized property or any property exchanged for it:

(a) is in the United States in connection with commercial activity carried on here by the foreign state; or

(b) is owned or operated by the foreign state's agency or instrumentality engaged in commercial activity here.

Of course the first of those alternatives is not met in this case. And the second, much like Section 1605(a)(1), appears to treat only with property of an "agency or instrumentality"—not of the sovereign itself (contrast the direct reference to the "foreign state" in the first alternative).

■ If that analysis of the Act is correct, Kianoosh is plainly out of court for want of jurisdiction. But even were it otherwise— even were it considered that Iran's immunity had somehow previously been waived— that waiver would have been superseded by the "Algerian Accords" and Executive Order 12294, 46 Fed.Reg. 14111 (1981) (the "Order," promulgated Feb. 24, 1981).

As is still fresh in the minds of all of us, the January 19, 1981 signing of the "Algerian Accords" ended the so-called "hostage crisis." Those Accords set up an Arbitral Tribunal to consider claims by American citizens against Iran. Accords Article VII, ¶ 2 provides:

Claims referred to the Arbitral Tribunal shall, as of the date of filing such claims with the Tribunal, be considered excluded from the jurisdiction of the courts of Iran, or of the United States, or of any other court.

On January 18, 1982 Kianoosh filed a claim with the United States-Iran Claims Tribunal at The Hague. Consequently the precise language of the Accords "excludes" Kianoosh's claims from this Court's consideration.

Of course the Accords must be read in light of the Order and the Supreme Court's decision in *Dames & Moore v. Regan*, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918

(1981) upholding its validity. Order Section 1 states in part (emphasis added):

All claims *which may be presented to the Iran-United States Claims Tribunal* under the terms of Article II of the [Accords] . . . and all claims for equitable or other judicial relief in connection with such claims, are hereby suspended, except as they may be presented to the Tribunal.

Order Section 3 provides:

Suspension under this Order of a claim or a portion thereof submitted to the Iran-United States Claims Tribunal for adjudication shall terminate upon a determination by the Tribunal that it does not have jurisdiction over such claim or such portion thereof.

Kianoosh was not a United States citizen when the acts that triggered his claims occurred,[2] or indeed when the Accords were signed or the Order promulgated. He was however such a citizen both when he filed his claim with the Tribunal and when he later filed this action. Thus the application of the Accords to Kianoosh's claims may be open to question.[3] But consistent with the general concept of "jurisdiction to decide jurisdiction," Section 3 of the Order leaves it to the *Tribunal* to decide whether a particular claim is within its jurisdiction. Once Kianoosh has invoked its power, he must await its decision of that question before he can pursue his claims elsewhere.

■ *Dames & Moore*, 101 S.Ct. at 2989, teaches that the Order does *not* oust the federal courts of *jurisdiction* over Kianoosh's claims:

. . . [W]e do not believe that the President has attempted to divest the federal courts of jurisdiction. Executive Order

---

2. Some of the damages he asserts continued to accrue after he acquired citizenship here. That should not be relevant to the analysis.

3. Accords Article II states (emphasis added): An International Arbitral Tribunal (the Iran-United States Claims Tribunal) is hereby established for the purpose of deciding claims of *nationals of the United States* against Iran and claims of nationals of Iran against the United States . . .

There are of course several alternative dates that might control in determining nationality for purposes of the Tribunal's jurisdiction: when the claim arose (that might be when the act that created the claim occurred or, if different, when the damages were sustained), when the Accords were signed, when the claim was filed with the Tribunal (and perhaps others).

No. 12294 purports only to "suspend" the claims, not divest the federal court of "jurisdiction...." The President has exercised the power, acquiesced in by Congress, to settle claims and, as such, has simply effected a change in the substantive law governing the lawsuit. Indeed, the very example of sovereign immunity belies petitioner's argument. No one would suggest that a determination of sovereign immunity divests the federal courts of "jurisdiction."

Although this Court's subject matter jurisdiction over Kianoosh's claims thus survives, a mere stay of those claims is inappropriate. *Dames & Moore*'s analogy to sovereign immunity provides the key. Where sovereign immunity bars a plaintiff's lawsuit, dismissal is called for. So it is here—at least unless and until the Tribunal were to reject jurisdiction. Accordingly Iran's motion to dismiss will be granted as to Kianoosh.[4]

### Claims of Javad, Ashraf and Nooshin

Kianoosh's co-plaintiffs are all aliens. Their claims pose a different breed of problems:

(1) whether any statute supports jurisdiction over an action by resident aliens against a foreign state where foreign law will provide the rule of decision; and

(2) if so, whether that statute is consistent with Article III of the Constitution.[5]

█ Nothing in Section 1332 remotely approaches coverage of such wholly alien-oriented lawsuits. Thus the Iranian nationals too must call on the Act as their ticket of admission to the federal courts (again this Court will assume *arguendo* that Iran is not entitled to immunity, despite the views expressed earlier in this opinion).

At the threshold they are met with the question whether they are within the class of plaintiffs for whose benefit Section 1330(a) and its corollary sections were enacted. There is a good deal of legislative history to support the proposition that the Act was *not* intended to provide a federal forum for *foreign* plaintiffs in suits against foreign states. *See, Verlinden B.V. v. Central Bank of Nigeria*, 647 F.2d 320, 323–24 (2d Cir. 1981), *cert. granted*, —— U.S. ——, 102 S.Ct. 997, 71 L.Ed.2d 291 (1982). Indeed a review of the evidence adduced by *Verlinden* on both sides of that issue indicates the contentions opposing jurisdiction are at least as persuasive as those favoring it. Moreover one argument to which *Verlinden* did not refer is the familiar principle favoring a statutory construction that would avoid a serious constitutional problem—in this case, a problem that led the *Verlinden* court to invalidate the Act as sought to be applied to alien plaintiffs. *See United States v. Clark*, 445 U.S. 23, 27, 100 S.Ct. 895, 899, 63 L.Ed.2d 171 (1980); *Califano v. Yamasaki*, 442 U.S. 682, 693, 99 S.Ct. 2545, 2553, 61 L.Ed.2d 176 (1979).

Nonetheless *Verlinden* concluded its analysis of the legislative history by deciding that the literal language of the Act ("any nonjury civil action against a foreign state") did open the federal courts to such suits, 647 F.2d at 324.[6] This opinion will

---

**4.** This dismissal is perforce without prejudice, although for the reasons already voiced this Court doubts the existence of jurisdiction in any case. If Kianoosh were to be spurned by the Tribunal and then seek to refile his claims in federal court, the law in this area might be better settled at that time, facilitating a definitive decision. In the meantime it seems prudential to avoid a jurisdictional decision that may never be necessary.

**5.** Because Kianoosh is out of the case, it is unnecessary to decide whether, as plaintiffs urge, his presence would provide "minimal diversity" so as to confer federal jurisdiction. That argument is unsound in any event, resting on a misreading of *State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 530–31, 87 S.Ct. 1199, 1203–04, 18 L.Ed.2d 270 (1967). *Tashire* made plain that the key to diversity jurisdiction, once Article III is satisfied, is the language employed by Congress. It will be recalled that Kianoosh did not fit within the general diversity grant of 28 U.S.C. § 1332, but had to rest (if at all) on the Act. And *it* speaks in terms that require each plaintiff to stand on his or her own, without any piggybacking.

**6.** That conclusion is shared by Professor Moore. 1 J. Moore, *Federal Practice and Procedure* ¶ 0.66[4] at 700.178–79 (2d ed. 1979).

assume the same premise to demonstrate that Javad, Ashraf and Nooshin lack jurisdictional access in any case.

Every statutory grant of federal jurisdiction must find its base in Article III, either as an echo or as an application of the constitutional language. Although Article III's diversity grant would have supported an action like Kianoosh's had Congress gone that far in Section 1332 (as it did not), the same language cannot sustain a suit solely between two aliens:

Controversies ... between a State, the Citizens thereof, and foreign States, Citizens or Subjects.

Congress then has no power under the diversity grant to require this Court to hear the remaining claims of the Complaint. *Hodgson v. Bowerbank*, 9 U.S. (5 Cranch) 303, 3 L.Ed. 108 (1809); *Montalet v. Murray*, 8 U.S. (4 Cranch) 46, 2 L.Ed. 545 (1807).

Plaintiffs must therefore turn, as did the plaintiff in *Verlinden*, to the federal question jurisdictional grant of Article III:

Cases ... arising under ... the Laws of the United States....[7]

On that score however they can point to no federal law under which their claimed causes of action arise—in the sense of creating substantive rights. Section 1330(a) and its corollary sections under the Act, like Sections 1331 (the congressional federal question grant) and 1332 (the congressional diversity grant), cannot play that role. *See Verlinden*, 647 F.2d at 325–27.

And even on the assumption that "arising under" in Article III terms is broader than the same term in Section 1331, *id.* at 327–28, ancient doctrine negates the notion that a case can "arise under" a statute (like the Act) that simply confers jurisdiction over a class of cases. *Mossman v. Higginson*, 4 U.S. (4 Dall.) 12, 1 L.Ed. 720 (1800). To permit such bootstrapping would be to set no bounds on Congress' ability to confer jurisdiction without reference to the "case or controversy" limits of Article III. As the *Verlinden* court put it, 647 F.2d at 329:

If we accepted the interpretation of the first phrase [of Article III, § 2, clause 1] necessary to find jurisdiction here—that a case can "arise under" a jurisdictional statute—then we could eliminate the other eight phrases from the clause. For example, if we decided that Verlinden's suit was one "arising under a law of the United States" because it was brought under § 1330, then we could similarly hold that a suit "arose under a law of the United States" because it was brought under § 1332. The constitutional diversity grant would then be surplusage. If we are not to read the other phrases out of the clause, we must restrict the first phrase to cases arising under a substantive law.

Under that restriction, only one arguably "substantive law" might possibly support plaintiffs' action. 28 U.S.C. § 1350 provides:

The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

Section 1350, like Section 1330(a), is a jurisdiction-conferring statute. But unlike Section 1330(a) it expresses substantive sources of decision for the federal courts for alien tort cases: the law of nations or a treaty of the United States.

For the reason already discussed at n.7, the Treaty of Amith does not fill the bill. *Accord, Eslami v. Government of Iran*, Civ. Act. No. 81–1505, slip op. at 2 (D.D.C. Jan. 28, 1982).

---

7. They also purport to rely on the treaty clause ("Cases ... arising under ... Treaties ... which shall be made..."). But they identify no substantive provision in the 1955 Treaty of Amity that would ground this action. As the text discussion of the federal question provision reflects, an "arising under" jurisdictional grant must involve a provision creating a cause of action, not just a procedural provision giving access to the courts. Treaty Article IV, ¶ 2 treats with taking of property without just compensation, but solely in terms of the property of nationals of one country within the *other's* territory. There is no hint of protecting either country's nationals against their *own* sovereign.

Similarly, the "law of nations" does not prohibit a government's expropriation of the property of its own nationals. *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980) decided that because physical torture violates the law of nations, Section 1350 would confer jurisdiction through the "arising under" clause. But *Dreyfus v. von Finck*, 534 F.2d 24, 30–31 (2d Cir.), *cert. denied*, 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976) had previously held that wrongful expropriation of a Jewish businessman's interest in a banking firm in Nazi Germany did *not* violate the law of nations and therefore could not ground an action under Section 1350. And the *Verlinden* court, which had decided both those cases, cited *Dreyfus* for the proposition that "commercial violations, such as those here alleged, do not constitute breaches of international law." 647 F.2d at 325 n.16.

It may be foreign to our way of life and thought, but the fact is that governmental expropriation is not so universally abhorred that its prohibition commands the "general assent of civilized nations" (*Filartiga*, 630 F.2d at 881)—a prerequisite to incorporation in the "law of nations." As noted by our Supreme Court in another context in *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428–30, 84 S.Ct. 923, 940–41, 11 L.Ed.2d 804 (1964), a sharp conflict of views exists in the world as to such expropriation, mainly between capital-exporting and capital-importing nations, and between socialist and capitalist nations. We cannot elevate our American-centered view of governmental taking of property without compensation into a rule that binds all "civilized nations." [8]

Iran's complained-of behavior thus cannot ground an action under Section 1350. Under those circumstances the *Verlinden* analysis would invalidate the Act to the extent it conferred jurisdiction over plaintiffs' claims.

Thus adherence to *Verlinden* would preclude acceptance of jurisdiction over the claims of Irani nationals Javad, Ashraf and Nooshin. It is of course true that certiorari has been granted in *Verlinden*, and the viability of that decision is therefore unknown. But it must be remembered that the Javad, Ashraf and Nooshin claims come within this Court's subject matter jurisdiction only if those plaintiffs can survive *each* of three potentially fatal defects:

(1) They must establish that Iran has waived its sovereign immunity, so that the Act provides a federal forum.

(2) They must bring themselves within the class of plaintiffs for whose benefit the Act was intended.

(3) They must show that the Act can extend jurisdiction over their claims without doing violence to Article III.

Any one of those strikes puts plaintiffs out of the game.[9]

For the reasons already expressed at some length, if this Court follows *Verlinden* the third requirement bars the alien plaintiffs' claims even if they could prevail on each of the first two. In the Court's view, however, they are likely on the losing side of all three issues. Dismissal on jurisdictional grounds is therefore appropriate.

### Conclusion

Iran's motion to dismiss Kianoosh's claims is granted. All claims by Javad, Ashraf and Nooshin are dismissed for want of subject matter jurisdiction.

---

8. It is relevant for this analysis that the expropriation challenged here affected property of the sovereign's own subjects. Conceptual difficulties confront the purely *intra* national wrong sought to be labeled a violation of *inter* national law.

9. This is reminiscent of the antediluvian period of the Court's youth, when the playground version of slow-pitch 12-inch softball followed the one-strike-is-out rule—a great stimulant to sharpen the batting eye.