Joseph J. CICIPPIO, Elham Cicippio, David Jacobson, Appellants,

v.

ISLAMIC REPUBLIC OF IRAN, Appellee.

No. 93–7047.

United States Court of Appeals, District of Columbia Circuit.

Argued May 19, 1994.

Decided July 29, 1994.

James Godin, Norristown, PA, of the Bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of the Court, argued the cause for appellants. On the briefs for appellants was Barbara A. Barnes.

Bruno A. Ristau, Washington, DC, argued the cause and filed the brief for appellee.

Before: WALD, SILBERMAN, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Appellants appeal from the district court's order dismissing their action against the Islamic Republic of Iran for lack of subject matter jurisdiction. Concluding that kidnapping is not, by its nature, a commercial act, that dealings directly between two sovereign states do not constitute "commercial activity" within the meaning of the Foreign Sovereign Immunities Act, and that the "noncommercial tort" exception does not apply, we affirm.

## I.

This case arises out of the well-publicized abductions of appellants Joseph Cicippio and David Jacobson in Lebanon.[1] Appellants' complaint alleges that while working in Lebanon, Cicippio and Jacobson were abducted by Islamic fundamentalists hired by

the State of Iran and held by those agents for an extended period of time, during which they were tortured.[2] Iran conditioned the release of Cicippio and Jacobson on the return of Iranian assets frozen in this country by the United States government. That abduction, it is also alleged, caused direct effects in the United States through the emotional harm suffered by the victims' families, the payment of monies to the captors by Mrs. Cicippio, and the unfreezing of Iranian assets. Jacobson and Cicippio, on the basis of these factual allegations, sought damages for a number of intentional torts and for violations of international law. They invoked the "commercial activity" and the "noncommercial tort" exceptions to the Foreign Sovereign Immunities Act (FSIA) as bases for federal court jurisdiction.

Appellee, the Islamic Republic of Iran, moved to dismiss the suit on grounds that the court lacked subject matter jurisdiction under the FSIA as well as personal jurisdiction over the defendant. The district court granted the motion to dismiss on lack of subject matter jurisdiction. It concluded that although Iran's alleged actions did appear to constitute "commercial activity" within the meaning of the FSIA—at least under the Supreme Court's analysis—"state-supported kidnapping, hostage-taking, and similar universally criminal ventures were simply not the sorts of proprietary enterprises within the contemplation of Congress when it enacted the 'commercial activity' exception to [the] FSIA." This appeal followed.

## II.

The Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.* (1988), provides that a "foreign state shall be immune from the jurisdiction of the courts of the United States and of the States." 28 U.S.C. § 1604 (1988). The Act does create, however, a number of exceptions to this immunity. Two are invoked here: the "commercial activity" and the "noncommercial tort" excep-

---

1. Appellants include Cicippio's wife, Elham Cicippio, as well.

2. In reviewing an order dismissing for lack of jurisdiction under Fed.R.Civ.P. 12(b)(1) we take all well-pleaded facts as true.

tions. *See* 28 U.S.C. §§ 1605(a)(2), 1605(a)(5) (1988). We consider them in turn.

### A.

The Act permits a suit against a foreign government to proceed in any case

> in which the action is based upon a commercial activity carried on in the United States by a foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or *upon an act outside the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.*

28 U.S.C. § 1605(a)(2) (1988) (emphasis added). Appellants rely on the third clause of this subsection; *i.e.*, they claim that the government of Iran committed an act in connection with commercial activity elsewhere. The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d) (1988). The subsection further directs that the "commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* We have not a little difficulty in understanding appellants' precise theory of the case because they do not clearly identify which of the allegations is the "act" and which makes up the "commercial activity". As best we can determine, appellants treat "hostage taking for profit" as both the act and the commercial activity. In other words, appellants do not specifically claim that the freezing or prospective unfreezing of Iranian assets (or the payments made by Cicippio's relatives) to gain his release constitute commercial activity, and that the kidnapping is an act in connection with that transaction. Instead, appellants present the situation as one integrated activity of a commercial nature which suggests that they should be suing under the first clause. We assume, however, that appellants are implicitly claiming that one of the acts relating to the abduction takes place "elsewhere" from the commercial activity. We therefore consider whether a foreign sovereign's alleged use of non-official agents to conduct alleged hostage takings to gain economic advantages can be considered a commercial activity.

■ The Supreme Court first had occasion to apply the FSIA's phrase "commercial activity" in *Republic of Argentina v. Weltover, Inc.,* —— U.S. ——, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992). There the government of Argentina had issued bonds payable in dollars to support its guarantee of payments of loans its domestic borrowers took from foreign creditors. When the Argentine government unilaterally extended the time of payment it was sued in New York (where payment was to be made) by foreign creditors. Drawing on the legislative history of the FSIA, as well as on the pre-Act practice of the State Department, the Court

> conclude[d] that when a foreign government acts, not as regulator of a market, but in the *manner* of a private player within it, the foreign sovereign's actions are "commercial" within the meaning of the FSIA. . . . [T]he issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in "trade and traffic or commerce." Thus, a foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or even bullets is a "commercial" activity, because private parties can similarly use sales contracts to acquire goods.

*Weltover,* —— U.S. at ——, 112 S.Ct. at 2166 (citations omitted) (emphasis added). The government of Argentina, recognizing that the statute made its purpose irrelevant, nevertheless argued that one could not ignore the context in which it issued the bonds—which was in order to enhance the ability of its citizens to borrow foreign capital, not like the ordinary commercial issuance of debt to raise capital or refinance debt. The court assumed *arguendo* that the notions of context and purpose might be different but rejected Argentina's argument because the bonds had been issued, just as might be done

by a private actor, to restructure the government's existing obligations. Putting aside for now the relationship between purpose and context, we take from *Weltover* the key proposition that in determining whether a given government activity is commercial under the act, we must ask whether the activity is one in which commercial actors typically engage.

Appellants insist that this formulation does not mean that when a sovereign is alleged to have engaged in *illegal* activities such activities should be thought not commercial *per se.* The Second Circuit had earlier determined that kidnapping (and assassination) could not be considered commercial activities under FSIA because a private person could not engage in such activity *lawfully. See Leletier v. Republic of Chile,* 748 F.2d 790, 797 (2d Cir.1984). Appellants point out, however, that all causes of action can be thought, in some sense, to accuse a defendant of acting unlawfully, and the distinction between tortious and criminal acts is not always clear.

The most recent FSIA Supreme Court decision, *Saudi Arabia v. Nelson,* —— U.S. ——, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993), may well undermine the Second Circuit's categorical approach. There an American plaintiff hired in the United States to work in a Saudi hospital claimed that he had been wrongly imprisoned and tortured by Saudi police in retaliation "for his whistle blowing" directed at certain hospital practices. Although the Second Circuit's approach offered the most obvious line of analysis, the Court did not take it. Instead, the Court concluded that since the basis of the claim was the alleged tortious—perhaps criminal—actions of the Saudi police (not the arguably commercial activity in recruiting Nelson), and private parties cannot exercise that *"sort "* of power while engaging in commerce, the activity could not be thought "commercial."[3]

■ The Court dismissed the contention that the Saudi government typically uses such techniques to resolve commercial disputes by emphasizing that the "powers allegedly abused were those of police and penal officers" and noting that "[i]n any event the argument is off the point, for it goes to purpose." —— U.S. at ——, 113 S.Ct. at 1480. The last observation, it seems to us, makes abundantly clear, on top of the statute and *Weltover,* that in this case we cannot consider the alleged motive of the Iranian government in determining whether appellants' claim if true would involve commercial activity. It is to the character and type of activity to which we should look; purpose must be disregarded and a plaintiff cannot, by describing the act in question as intertwined with its purpose, avoid the statutory preclusion. That leaves the issue whether the hostage taking itself can be described as a commercial activity—without regard to its purpose.

· Appellants, relying on *Nelson,* assert that it can and should be so regarded. Because the Supreme Court in *Nelson* rested on the governmental status of the police alleged to have tortured the plaintiff, rather than the character of the act, one might believe that if those very acts had been conducted on behalf of the Saudi government by contract thugs the Saudi government would not have enjoyed immunity under the statute. Justice White, concurring, made exactly that point. —— U.S. at ——, ——, 113 S.Ct. at 1481, 1482.

We do not think, however, that appellants (or Justice White) correctly read the Court's opinion—which, admittedly, is somewhat puzzling.[4] The Court never conceded the validity of Justice White's supposition. By focusing on the status of the perpetrators, the Court avoided the hypothetical Justice White posed: "we do not address the case where a claim [based on commercial activity] consists of both commercial and sovereign elements [such as where private individuals had been employed to torture the plaintiffs]. We do

---

3. The claim was brought under Clause 1 of the Act so the Court did not consider whether the torture could be regarded as an act in connection with the commercial activity of operating the hospital.

4. Justice White accused the majority of a "single minded focus on the exercise of police power, [which] while simplifying the case hardly does it justice." —— U.S. at —— ——, 113 S.Ct. at 1482–83. The majority's focus does seem a bit artificial.

conclude, however, that where a claim rests entirely upon activities sovereign in character—as here—jurisdiction will not exist under the clause regardless of any connection the sovereign acts may have with commercial activity." *Id.* at ——, 113 S.Ct. at 1478 n. 4 (internal citation omitted).

■ In our case, since we cannot say that the alleged tortious conduct rests entirely upon activities sovereign *in character*, because the kidnappers are not alleged to have been officials of the Iranian government, we cannot dismiss appellants' claim on that basis. On the other hand, to accept appellants' claim would be to declare that all such acts, regardless of context, sponsored openly or covertly by a sovereign power are outside the immunity granted by the FSIA unless conducted directly by acknowledged government officials. We think that cannot be what Congress intended. Although the purpose and perhaps the illegal character of the alleged acts are irrelevant in judging their commercial character, to return to the notion assumed *arguendo* in *Weltover*, the context in which the acts take place must be germane. Even Justice White, who thought the allegations in *Nelson* did make out a claim of commercial activity, rested his view on the commercial character of the hospital where Nelson was employed. —— U.S. at —— – ——, 113 S.Ct. at 1481–82. Unless an act takes place in a commercial context it would be impossible to determine whether it is conducted in the manner of a private player in the market. Otherwise, any act directed by a foreign government and carried out by irregular operatives in whatever circumstances could be thought commercial including isolated acts of assassination, extortion, blackmail, and kidnapping (for, perhaps, the sexual pleasure of a depraved monarch). That can hardly be what Congress meant by commercial activity nor what the *Weltover* Court thought were typical acts of market participants.

■ Insisting that a given act be judged in context before concluding whether it is commercial activity is not inconsistent with eschewing consideration of purpose. The pro-

vision of the statute which requires us to ignore purpose was obviously designed to prevent the foreign sovereign from casting a governmental purpose, which always can be found, as a cloak of protection over typical commercial activities, not to reach out to cover all sorts of alleged nefarious acts that are grist for John Le Carre novels. Here the kidnapping *by itself* cannot possibly be described as an act typically performed by participants in the market (unless one distorts the notion of a marketplace to include a hostage bazaar). That money was allegedly sought from relatives of the hostages could not make an ordinary kidnapping a commercial act any more than murder by itself would be treated as a commercial activity merely because the killer is paid. Perhaps a kidnapping of a commercial rival could be thought to be a commercial activity. If so, it would not be because the kidnappers demanded a ransom, but because the kidnapping took place in a commercial context.

■ There remains the question whether the kidnapping can be thought as an act, not itself a commercial activity, but taken in connection with commercial activity elsewhere. The commercial activity under that reading would be presumably, the Iranian government's continued effort to gain the unfreezing of its assets in the United States.[5] We do not think, however, that those efforts are properly regarded under the Act as commercial. The United States government was acting purely as a sovereign regulator when it froze the assets of Iran and its citizens, and the government of Iran's alleged efforts to release the freeze were likewise peculiarly sovereign. When two governments deal directly with each other *as governments*, even when the subject matter may relate to the commercial activities of its citizens or governmental entities, or even the commercial activity conducted by government subsidiaries, those dealings are not akin to that of participants in a marketplace. Governments negotiating with each other invariably take into account non-marketplace. considerations—most obviously political relations—

---

5. As we have already noted ordinary kidnapping for ransom is not a commercial activity so the

alleged request that Cicippio's wife pay money for his return adds nothing.

and so they cannot be thought to be behaving, in that setting, as businessmen.[6]

### B.

█ Appellants alternatively invoke the "noncommercial tort" exception to the FSIA. That exception, codified at 28 U.S.C. § 1605(a)(5), provides that a foreign state shall not be immune in any case "in which money damages are sought against a foreign state for personal injury . . . occurring in the United States and caused by the tortious act or omission of that foreign state. . . ." We have held that this exception requires that both the tortious act as well as the injury occur in the United States. *See Persinger v. Islamic Republic of Iran,* 729 F.2d 835, 842 (D.C.Cir.1984).[7] Appellants criticize that opinion, but we are of course bound by it. There is no dispute that the tortious actions of which appellants complain occurred in Lebanon. Accordingly, the noncommercial tort exception to the FSIA's grant of immunity is inapplicable.

\*　　\*　　\*　　\*　　\*　　\*

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered.*

---

**6.** We, therefore, need not decide whether there were "direct effects" in the United States.

**7.** The Supreme Court apparently reached the same result in *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989), although the matter is not entirely free from doubt and its statements on this point were in *dicta.* In the course of concluding that "[b]ecause respondents' *injury* unquestionably occurred well outside the 3-mile limit then in effect for the territorial waters of the United States, the exception for noncommercial torts cannot apply," *id.* at 441, 109 S.Ct. at 692 (emphasis added), the Court noted that the "tortious *attack* " on respondent's ship occurred outside the United States, *id.* at 440, 109 S.Ct. at 691 (emphasis added), a statement that might imply that the tortious conduct, as well as the injury, must occur within the United States. The Court, however, might simply have relied on the location of the attack as grounds for concluding that the "injury" occurred outside the United States. At any rate, having concluded that Amerada Hess' injury did not occur in the United States—a requirement explicitly imposed by the FSIA—any statements about where the *tortious conduct* occurred were *dicta.* It is therefore still unclear what position the Supreme Court would take if faced with a suit alleging tortious conduct occurring abroad that caused injury in the United States.