Henry T. SOUTHWAY, Southway Construction Company, Inc., Douglas Houghton, Randy Thurston, J.E. Losavio, Jr., and Russ Gray, doing business as Gray Real Estate, Plaintiffs,

v.

CENTRAL BANK OF NIGERIA, Republic of Nigeria, The Law Firm of Kirk P. Brown, P.C., Kirk Patterson Brown, Helen Tomicich, also known as Helen Tomicich Brown, [Both Browns] individually and doing business as The Communications Connection, Defendants.

Civil Action No. 96–B–2540.

United States District Court, D. Colorado.

Feb. 26, 1998.

---

1302

J.E. Losavio, Jr., Margaret L. Herdeck, William Judson Culver, Law Offices of J.E. Losavio, Jr., Pueblo, CO, for Plaintiffs.

Michael A. Williams, Steven D. Plissey, Williams, Youle & Koenigs, P.C., Denver, CO, Helen Tomicich, Pueblo, CO, Kirk P. Brown, Pueblo, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Defendants Central Bank of Nigeria (CBN) and Republic of Nigeria (Nigeria) (collectively, "Nigeria defendants"), move for dismissal of plaintiffs' complaint pursuant to Fed.R.Civ.P. 12(b)(1), 12(b)(2), and 12(b)(6). The motions are adequately briefed and oral argument will not materially aid their resolution. For the reasons set forth below, I deny the Nigeria defendants' motions to dismiss.

### I. FACTS

The material facts, with disputes resolved in plaintiffs' favor, follow. Plaintiffs are residents of southern Colorado. Defendants Kirk Patterson Brown (Mr. Brown) and Helen Tomicich Brown (Mrs. Brown) are also residents of southern Colorado. Mr. Brown is an attorney licensed to practice law in the State of Colorado and operates a law firm in Pueblo, Colorado.

In November 1995, Mr. Brown received a letter in Pueblo from Nigeria. The author claimed to be a representative of the Nigerian National Petroleum Corporation (NNPC). The person claimed to have access to $21,320,000.00, which funds resulted from an "over-invoiced" contract with a foreign contractor. The letter implied that NNPC already paid the foreign contractor, but that an accounting error caused the over-invoice. The alleged representative of NNPC hoped to secure the over-invoiced funds by wire-transferring such funds to a foreign company's account. The purported NNPC representative claimed that officials of the Nigerian government would aid the transfer in consideration for a large percentage of the funds. It was also stated that Mr. Brown would receive a percentage of the funds if he claimed to be a subsidiary of the original foreign firm and allowed use of his bank account. The letter contained a fax number that Mr. Brown should contact if the proposal interested him. It did and Mr. Brown began to communicate directly with purported representatives of NNPC.

Shortly thereafter, on November 30, 1995, Mr. Brown sent a letter, via facsimile transmission, to "Dr. T.S. Adedipe, Office of the Director General, Contract Review Panel, Federal Secretariat Complex" in Ikoyi–Lagos, Nigeria. The letter appears on letterhead from "The Communication Connection, Inc.," located at 196 Alhambra, Pueblo, Colorado. Mr. Brown signed the letter as "Kirk P. Brown, Corporate Secretary." The letter requests "settlement" of a bill past due in the amount of $21,320,000.00. The letter references "Contract No. NNPC/PED/2039–X92," regarding "Supply of Heavy Duty Crude Oil Passage Drilling Machines and Calibrators for Port–Harcourt, Warri, and Kaduna Refineries." The letter requests immediate wire transfer of such funds to Mr. Brown's bank account in Pueblo.

This letter, together with six other letters attached to and incorporated within the complaint evidence communications between Mr. Brown and people purporting to be representatives of Nigeria, NNPC, and CBN. All communications reference "Contract No. NNPC/PED/2039–X92" and appear on official-looking letterhead, bearing various stamps and signatures.

The first communication is a letter from "Bunu Isiaka, Debt Reconciliation Officer of CBN's Office of Debt Reconciliation Committee, Foreign Operations Department in Tinubu Square, Lagos, Nigeria" to Mr. Brown, "The Managing Director, Communications Connections, Inc.," dated February 3, 1996 (Isiaka Letter). The Isiaka Letter directs Mr. Brown to pay a 1% stamp duty fee of $213,200.00, via wire transfer, to the account of "M.M.B. LTD." at "Citibank N.A." in New York. The Isiaka Letter identifies the beneficiary of such account as "A. Dan–Azumi."

The second is a letter from "Dr. B.O. Eguaibor, Principal Partner, Eguaibor & Eguaibor, Solicitors and Advocates, Ikeja, Lagos State" to Mr. Brown dated February 7, 1996 (First Eguaibor Letter). The Eguaibor Letter acknowledges receipt of $2,000.00 from Mr. Brown as payment for legal representation regarding receipt of the over-invoiced contract funds. The Eguaibor Letter instructs Mr. Brown to transfer an additional $21,320.00 for payment of a "Bond Fee."

The third is another letter from "Dr. B.O. Eguaibor, Principal Partner, Eguaibor & Eguaibor, Solicitors and Advocates, Ikeja, Lagos State" to Mr. Brown dated February 21, 1996 (Second Eguaibor Letter). The Second Eguaibor Letter states that Dr. Eguaibor has signed the necessary papers to release the over-invoiced funds to Mr. Brown and instructs Mr. Brown to remit $100,000.00 to Eguaibor & Eguaibor after receipt of the over-invoiced funds.

The next is a letter from "Dr. M.R. Rasheed, Director, Foreign Operations Department" of CBN to Mr. Brown, "The Managing Director, Communications Connections, Inc.," dated March 19, 1996 (First Rasheed Letter). The First Rasheed Letter acknowledges receipt, via wire transfer, of $32,000.00 from Mr. Brown for "Handling/Cable/Signing Fees."

The fifth communication is a letter from "Dr. M.R. Rasheed, Director, Foreign Operations Department" of CBN to "Alberta L. Vega" of the Pueblo District Office of "The Honourable Senator Ben Nighthorse Campbell, United States of America Senate" dated March 25, 1996 (Second Rasheed Letter). The Second Rasheed Letter states that Communications Connections, Inc. will receive payment of $21,320,000.00 less "Refund Tax" as soon as Communications Connections, Inc. satisfies its "obligation in regard to the stamp duty payment of $213,200.00."

The last is a letter from "Major General Joe Garba" of the "Foreign Exchange Allocation Department, Office of the Presidency, Garki District Office, Abuja, Nigeria" to Mr. Brown of "Communications Connections, Inc. c/o Law Firm of Kirk P. Brown" dated April 12, 1996 (Garba Letter). The Garba Letter, which appears on official-looking government letterhead bearing various stamps and signatures, directs Mr. Brown to pay $319,800.00 to the account of "Gulf Bank Auto Account" at "Bankers Trust" in New York. The Garba letter identifies the beneficiary of such account as "Alvan Pharood."

In March 1996, Mr. and Mrs. Brown, purportedly short the funds necessary to take full advantage of this opportunity, contacted plaintiffs Randy Thurston (Thurston) and J.E. Losavio, Jr. (Losavio) (himself a lawyer and former Colorado State district attorney) regarding an investment opportunity. Mr. and Mrs. Brown offered Thurston and Losavio the opportunity to invest in a contract between The Communications Connection, Inc. and Nigeria. Mr. and Mrs. Brown encouraged Thurston and Losavio to invest $213,200.00 to pay for "stamp duties" and enable the transfer of $21,300,000.00 to the trust account of the Law Firm of Kirk. P. Brown, P.C. Mr. and Mrs. Brown represented that The Communications Connection, Inc. and Mr. Brown would receive a commission of $2,100,000.00 from CBN. They offered to "split" the commission with Thurston and Losavio, entitling Thurston and Losavio to $1,065,00.00 (a true split would be $1,050,000.00) in return for their $213,200.00 investment. Thurston and Losavio accepted. On March 27, 1996, Mr. and Mrs.

Brown, Thurston, and Losavio entered into a "Reimbursement Agreement" and "Indemnity Agreement" memorializing the transaction.

In April 1996, Mr. Brown contacted plaintiff Russ Gray (Gray) regarding the Nigeria transaction. Mr. Brown represented to Gray that he was a party to a financial transaction with Nigeria involving millions of dollars. Mr. Brown advised that the transaction would close in thirty days, but Mr. Brown had insufficient funds to fulfill his financial obligation. Gray, doing business as Gray Real Estate, paid Mr. Brown $50,000.00.

Also in April 1996, Mr. Brown contacted plaintiff Henry T. Southway (Southway). Mr. Brown represented to Southway that CBN would transfer millions of dollars to Mr. Brown's trust account, but that Mr. Brown needed to pay certain fees to exchange Nigerian currency for United States dollars. In consideration for Southway's payment of $160,000.00, Mr. Brown offered to pay Southway $800,000.00 "upon receipt of the contract funds into his law firm trust account from the Central Bank of Nigeria and the government of Nigeria." Southway accepted Mr. Brown's offer. On April 15, 1996, Mr. Brown and Southway entered into a written agreement memorializing the transaction.

On approximately the same date in April 1996, Mr. and Mrs. Brown contacted plaintiff Douglas Houghton (Houghton). Mr. and Mrs. Brown represented to Houghton that they "brokered a contract on the sale of oil field equipment" to NNPC. Mr. and Mrs. Brown told Houghton that the contract was complete and ready for disbursement, but that they needed to raise 1.5% of the total contract amount to pay for "exchange rate levies." They offered to pay Houghton $550,000.00 in consideration for Houghton's loan of $110,000.00. Mr. and Mrs. Brown also offered to "personally indemnify" Houghton for his investment "if something goes wrong." Houghton also accepted their offer. On April 16, 1996, Mr. and Mrs. Brown and Houghton entered into an "Indemnity Agreement" memorializing the transaction.

The proverbial ship never came in. To everyone's chagrin, the expected wire trans-

fer of $21,300,000.00 never arrived in Mr. Brown's trust account, precluding Mr. and Mrs. Brown from satisfying their obligations to plaintiffs. Plaintiffs then filed suit on November 1, 1996. Plaintiffs allege violation of the Racketeer Influenced and Corrupt Organizations Act of 1970 (RICO), 18 U.S.C. §§ 1961–1968 (1994). The predicate acts on which plaintiffs base their civil RICO claim are violations of Colorado and federal law: (1) theft in violation of C.R.S. §§ 18–4–401; (2) securities fraud in violation of 15 U.S.C. §§ 77b(1), 77e, 77q, and 77x; (3) mail fraud in violation of 18 U.S.C. § 1341; (4) wire fraud in violation of 18 U.S.C. § 1343; (5) transfer of stolen property in violation of 18 U.S.C. §§ 2314 and 2315; and (6) violations of unspecified international law. Plaintiffs allege that the stolen money ultimately went to a criminal association of Nigerians and Americans composed of:

Major General Joe Garba,

Office of the Presidency, Republic of Nigeria

Dr. Paul Ogwuma, Governor, Central Bank of Nigeria

Dr. M.R. Rasheed, Director, International Remittance Department, Central Bank of Nigeria

Bunu Isiaka, Debt Reconciliation Officer, Central Bank of Nigeria

A. Dan-Azumi

Dr. T.S. Adedipe

Dr. B.O. Eguaibor

Kirk Brown

Helen Tomicich

Central Bank of Nigeria

The Law Firm of Kirk P. Brown

The Communication Connection, Inc.

(Compl. ¶ 6.)

The Nigeria defendants move for dismissal of plaintiffs' complaint pursuant to Fed. R.Civ.P. 12(b)(1), 12(b)(2), and 12(b)(6). The Nigeria defendants argue that: (1) this court has no subject matter jurisdiction over them; (2) this court has no personal jurisdiction over them because they lack sufficient contacts with this forum; and (3) the courts of the United States have no criminal jurisdiction over them and, without such jurisdiction,

plaintiffs' RICO claim fails to state a claim upon which relief can be granted.

## III. LEGAL STANDARDS APPLICABLE TO MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

Fed.R.Civ.P. 12(b)(1) empowers a court to dismiss a complaint for "lack of jurisdiction over the subject matter." As courts of limited jurisdiction, federal courts may only adjudicate cases that the Constitution and Congress have granted them authority to hear. *See* U.S. Const. art. III, § 2; *Morris v. City of Hobart*, 39 F.3d 1105, 1110 (10th Cir.1994), *cert. denied*, 514 U.S. 1109, 115 S.Ct. 1960, 131 L.Ed.2d 852 (1995). Statutes conferring jurisdiction on federal courts are to be strictly construed. *F & S Constr. Co. v. Jensen*, 337 F.2d 160, 161 (10th Cir. 1964). A Rule 12(b)(1) motion to dismiss "must be determined from the allegations of fact in the complaint, without regard to mere conclusory allegations of jurisdiction." *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir.1971). The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction. *See Basso v. Utah Power and Light Co.*, 495 F.2d 906, 909 (10th Cir.1974).

Motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) may take two forms. First, if a party attacks the facial sufficiency of the complaint, the court must accept the allegations of the complaint as true. *Holt v. United States*, 46 F.3d 1000, 1002–1003 (10th Cir.1995). Second, if a party attacks the factual assertions regarding subject matter jurisdiction through affidavits and other documents, the court may make its own findings of fact. *Holt* at 1003. A court's consideration of evidence outside the pleadings will not convert the motion to dismiss to a motion for summary judgment under Fed.R.Civ.P. 56. *Holt* at 1003.

## IV. ANALYSIS OF SUBJECT MATTER JURISDICTION

The Foreign Sovereign Immunities Act of 1976 (FSIA), as amended, 28 U.S.C. §§ 1330, 1441(d), and 1602–1608 (1994 & Supp.1997), provides the exclusive means by which the courts of this country may obtain jurisdiction over a foreign state or its agency

or instrumentality. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). Foreign states and their agencies or instrumentalities are presumptively immune from suit in the courts of the United States. Once a foreign state makes a prima facie showing of immunity, a plaintiff seeking to litigate in the United States bears the burden of showing a specified exception of the FSIA or an existing international agreement conferring jurisdiction. *Saudi Arabia v. Nelson*, 507 U.S. 349, 376, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). Section 1604 of the FSIA states:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

28 U.S.C. § 1604. Failure to satisfy the statute's exceptions deprives the district court of subject matter jurisdiction. *Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines*, 965 F.2d 1375, 1383 (5th Cir. 1992) (citations omitted).

The parties do not dispute that Nigeria, CBN, and NNPC are "foreign states" as defined by the FSIA. *See, e.g., Adler v. Federal Republic of Nigeria*, 107 F.3d 720, 723 (9th Cir.1997); *Caribbean Trading and Fidelity Corp. v. Nigerian Nat. Petroleum Corp.*, 948 F.2d 111, 112 (2d Cir.1991); *Verlinden B.V. v. Central Bank of Nigeria*, 647 F.2d 320, 322 n. 4 (2d Cir.1981), *rev'd on other grounds*, 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). The Nigeria defendants, therefore, have made a prima facie showing of sovereign immunity. Thus, plaintiffs bear the burden of showing a specific exception of the FSIA or an existing international agreement conferring subject matter jurisdiction upon this court.

The Nigeria defendants move to dismiss plaintiffs' complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). The Nigeria defendants make four separate arguments regarding subject matter jurisdiction. The validity of each argument depends on the proper interpretation of the FSIA. First, the Nigeria defendants argue that plaintiffs fail to

state a RICO claim upon which relief can be granted because the FSIA does not confer criminal jurisdiction to federal courts over a foreign state or its agencies. Though plead as a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6), the validity of this argument depends primarily on interpretation of the FSIA. Thus, I construe the argument as a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). Nonetheless, because this first argument is a facial challenge to the sufficiency of the complaint, I accept the allegations of the complaint as true. *Holt* at 1002–1003.

Second, the Nigeria defendants argue that the FSIA's commercial activity exception, 28 U.S.C. § 1605(a)(2), does not apply to their conduct and, therefore, they are immune from suit. Third, the Nigeria defendants argue that, even if their conduct falls within the commercial activity exception, the FSIA's noncommercial tort exception, 28 U.S.C. § 1605(a)(5), restores their sovereign immunity. Both the second and third arguments present facial challenges to the sufficiency of the complaint.

Fourth, the Nigeria defendants contend that, even if the alleged conduct falls within the "commercial activity" exception, the plaintiffs have not shown that the Nigeria defendants actually participated in such conduct. Specifically, the Nigeria defendants contend that the Nigerians who defrauded plaintiffs falsely represented themselves as Nigerian officials. This fourth argument attacks the factual assertions of the complaint and is not a facial challenge. I address each argument separately.

### a. The FSIA and Plaintiffs' Civil RICO Claim

██ Only one published decision addresses whether a foreign sovereign is a proper defendant in a civil RICO action when the "predicate acts" are violations of federal criminal law. In *Gould, Inc. v. Mitsui Min. & Smelting Co., Ltd.,* 750 F.Supp. 838 (N.D.Ohio 1990), Gould brought civil RICO claims against two foreign competitors, alleging that the foreign competitors obtained trade secrets misappropriated by a former employee of Gould. The predicate acts on which Gould based its RICO claims were acts of mail and wire fraud in violation of 18

U.S.C. §§ 1341 and 1343, respectively. *Gould* at 844.

One of the foreign competitors, Pechiney/Trefimetaux (P/T), moved to dismiss Gould's RICO claim. P/T argued that, as a "foreign state" governed by the FSIA, it was immune from the criminal jurisdiction of the United States. Without criminal jurisdiction, P/T contended that it is legally incapable of being indicted for violations of the federal mail and wire fraud statutes. *Gould* at 843–844. Because RICO defines "racketeering activity" as "any act which is indictable," 18 U.S.C. § 1961(1)(B), P/T argued that Gould's RICO claim failed as a matter of law. Gould conceded that P/T was a "foreign state" as defined by the FSIA. *Gould* at 843–844.

The Ohio District Court began its analysis by reviewing 28 U.S.C. § 1330(a), which states:

> The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity under sections 1605–1607 of this title or under any applicable international agreement.

28 U.S.C. § 1330(a). Because § 1330(a) confers only civil jurisdiction, the Ohio District Court concluded that the courts of the United States did not have criminal jurisdiction over foreign states. Without criminal jurisdiction over P/T, the Ohio District Court determined that P/T was immune from criminal indictment. This determination proved fatal to Gould's RICO claim, for RICO defines "racketeering activity" as "any act which is indictable," 18 U.S.C. § 1961(1)(B). Thus, the Ohio District Court held that Gould could not sue P/T for violation of RICO in a United States court. *Gould* at 844.

The only other court to address this question declined to follow the *Gould* decision. In *United States v. Hendron,* 813 F.Supp. 973 (E.D.N.Y.1993), the United States indicted the Director of Production of a Polish corporation for importing assault weapons into the United States without a license. The government of Poland owned the corpo-

ration and the Polish official claimed that he acted in his official capacity. The Polish official moved to dismiss the indictment, arguing that the FSIA immunized him from the criminal jurisdiction of the United States courts. *Hendron* at 974.

The New York District Court held that the provisions of the FSIA apply to civil cases only, precluding application of the FSIA to criminal prosecutions. It acknowledged the broad language of § 1604 (quoted above) and Congress' failure to differentiate between criminal and civil jurisdiction when drafting the FSIA. The New York District Court discussed the other eight sections of the FSIA and determined, however, that "the Act contains a panoply of provisions that are consistent only with an application to civil cases and not to criminal proceedings." *Hendron* at 976. The Court concluded that any criminal activity having a direct effect inside the United States is within the jurisdiction of the laws of the United States. *Hendron* at 976 (citation omitted). The Court held that it had jurisdiction over the criminal action against the Polish official, even if he acted in his official capacity.

*Hendron* is plainly inapposite because this case is not prosecuted by the United States by way of indictment against the Nigeria defendants. In short, there is no criminal charge and, thus, I exercise no criminal jurisdiction. As private parties, plaintiffs do not, nor could they, attempt to invoke the criminal jurisdiction of this court. Rather, they invoke the civil jurisdiction of this court pursuant to RICO's civil provision, which states in relevant part:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.

18 U.S.C. § 1964(c).

*Gould*'s alchemic rationale is flawed in its conversion of conduct giving rise to civil RICO jurisdiction into criminal prosecution in reliance upon the definitions of "racketeer-

ing activity" as "any act which is indictable." 18 U.S.C. § 1961(1)(B). I hold that the FSIA plainly confers jurisdiction over civil RICO actions against a foreign sovereign. 28 U.S.C. § 1330(a). Of course, plaintiffs must show that a specific exception of the FSIA or an existing international agreement confers subject matter jurisdiction upon this court. 28 U.S.C. § 1604. Plaintiffs rely only on the former, not the latter.

### b. The FSIA's Commercial Exception

 Plaintiffs argue that jurisdiction is conferred by FSIA's commercial exception, 28 U.S.C. § 1605(a)(2), which states:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ... in which the action is based: [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;
>
> ....

28 U.S.C. § 1605(a)(2) (1994) (bracketed numbers added). The commercial exception prevents foreign states from hiding behind their sovereignty when acting as market participants. Section 1605(a)(2) contains three separate clauses, each establishing variant criteria for the determination whether subject matter jurisdiction exists. *See Saudi Arabia v. Nelson*, 507 U.S. at 356 (interpreting first clause); *see also Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (interpreting third clause). Each clause, though, requires the existence of "commercial activity."

Plaintiffs fail to identify the clause of § 1605(a)(2) on which they rely. In their response brief, plaintiffs frequently cite to *Weltover* and *Adler v. Federal Republic of Nigeria*, 107 F.3d 720 (9th Cir.1997). Both *Weltover* and *Adler* interpret the third clause of § 1605(a)(2). Because I conclude that the third clause of § 1605(a)(2) confers subject

matter jurisdiction over this action, I do not discuss the first and second clauses.

The third clause of § 1605(a)(2) requires a three-step analysis. The determination focuses on whether the plaintiffs' action is: (1) "based ... upon an act outside the territory of the United States"; (2) that was done "in connection with a commercial activity" of Nigeria outside this country; and (3) that caused a "direct effect" in the United States. *Weltover*, 504 U.S. at 611; *accord Adler* at 724. The Nigeria defendants do not contest that Plaintiffs base their claims upon particular conduct that occurred outside the United States. The dispute is whether the Nigeria defendants' conduct was done "in connection with a commercial activity."

The FSIA's definition section purports to define "commercial activity:"

A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d) (1994). In *Weltover*, the Supreme Court acknowledged that the definition "leaves the critical term 'commercial' largely undefined." *Weltover* at 612. Hence, the Supreme Court looked to the "restrictive" theory of sovereign immunity adopted by lower federal courts after 1952. The Supreme Court arrived at the following formulation:

... we conclude that when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are "commercial" within the meaning of the FSIA. Moreover, because the Act provides that the commercial character of an act is to be determined by reference to its "nature" rather than its "purpose," the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in "trade and traffic or commerce." Thus, a foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or even bullets is a "commercial" activity, because private companies can similarly use sales contracts to acquire goods.

*Weltover* at 614–615 (citations omitted); *reiterated in Saudi Arabia v. Nelson*, 507 U.S. at 360–361.

Applying this test, I conclude that the Nigeria defendants engaged in "commercial activity." A purported representative of NNPC entered into an agreement for the assignment of contract proceeds. The alleged agreement assigned to Mr. Brown the right to receive partial payment on a contract between NNPC and a foreign company, in consideration for usage of Mr. Brown's bank account to facilitate the transfer of over-invoiced funds. Alleged representatives of NNPC and CBN referred to the underlying contract as "Contract No. NNPC/PED/2039–X92" in their letters. The underlying contract between NNPC and the foreign country allegedly involved the supply of "Heavy Duty Crude Oil Passage Drilling Machines and Calibrators for Port–Harcourt, Warri, and Kaduna Refineries." Accepting plaintiffs' allegations as true, one can only conclude that the Nigeria defendants engaged in "commercial activity."

The Nigeria defendants contend, however, that the actions of NNPC and CBN cannot constitute "commercial activity" because a scheme to defraud and commit theft of money is not the type of activity in which commercial actors typically engage. This argument however, focuses on the motives of NNPC and CBN. The argument thus refers to the "purpose" of the transaction rather than its "nature." While the formulation established by the Supreme Court in *Weltover* emphasizes form over substance, the inquiry furthers the prime directive of FSIA's commercial exception: preventing foreign states from hiding behind their sovereignty when they act as market participants. Recognition of the Nigeria defendants' argument would confer immunity upon a sovereign whenever

the sovereign could characterize its motives as noncommercial, regardless of the nature of the underlying transaction. Such argument does not comport with Congressional intent, the Supreme Court's interpretation of the FSIA, or the restrictive theory of sovereign immunity on which the FSIA is premised.

Indeed, several courts have found that "commercial activity" exists even when the foreign sovereign's motives are nefarious. *See, e.g., American Bonded Warehouse Corp. v. Compagnie Nationale Air France*, 653 F.Supp. 861, 864 (N.D.Ill.1987) (scheme to eliminate competition in freight forwarding industry in violation of RICO); *see also Transamerican S.S. Corp. v. Somali Democratic Republic*, 767 F.2d 998, 1001–1002 (D.C.Cir.1985) (foreign agency's wrongful seizure of ship and demand for $36,162.57 U.S. as a "pro forma disbursement"); *Wyle v. Bank Melli of Tehran, Iran*, 577 F.Supp. 1148, 1158–1159 (N.D.Cal.1983) (conspiracy between Iran, Iranian port, Iranian shipping organization, and Iranian bank to make fraudulent demand on letter of credit).

The Nigeria defendants' reliance on *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164 (D.C.Cir.1994), is misplaced. In *Cicippio*, the plaintiffs were kidnaped while working in Iran. Iran conditioned the release of plaintiffs on the return of Iranian assets frozen by the United States government. *Cicippio* at 165. The District of Columbia Court of Appeals concluded that the demand for money could not make the act of ordinary kidnaping a commercial act "any more than murder by itself would be treated as a commercial activity merely because the killer is paid." *Id.* Thus *Cicippio* presents a dramatically different factual scenario than the allegations made by plaintiffs here.

*Adler*, decided by the Ninth Circuit in 1997, is persuasive precedent. There, James Adler received from Nigeria a letter describing an investment opportunity from which Adler could receive a substantial commission. The letter explained that former members of the ruling party had misused their positions of power to create companies and award themselves over-invoiced contracts. The letter indicated that Nigeria's new government approved payment of the contracts and that Adler could receive a commission by arrang-

ing for payment of one of the contracts by allowing usage of his foreign bank account. Mr. Adler was told that the underlying contract was between a foreign company and NNPC for the computerization of Nigerian oil fields. *Adler* at 722–723.

Like plaintiffs here, Mr. Adler was also told that the foreign company finished the work but had not received full payment. Mr. Adler accepted the assignment and instructed CBN to transfer funds to his bank account in New York. He paid over $5,000,000.00 for deposit fees, transfer fees, cable charges, taxes, surcharges, and stamp duties. When his ship sank, he filed suit against Nigeria, CBN, NNPC, Paul Ogwuma, and seventeen other Nigerian citizens. *Adler* at 723. The district court denied defendants' motion to dismiss on the ground that they were immune from suit in the United States. The Ninth Circuit affirmed. In a well-reasoned decision, the Ninth Circuit held that the conduct described was "commercial activity" as required by § 1605(a)(2). *Adler* at 725–726. The Ninth Circuit also rejected Nigeria's argument that its activities of collecting taxes for the performance of official government acts were sovereign acts:

> ... the FSIA does not require that every act by the foreign state be commercial for the third clause of the commercial activity exception to apply.... Rather, its activities must merely be made "in connection with" a commercial activity.

*Adler* at 725–726. The case before me is the same song, second verse. Accordingly, I conclude that the activity carried on by the Nigeria defendants is "commercial activity." The Nigeria defendants, therefore, are not entitled to immunity pursuant to § 1604. Consequently, § 1330(a) confers subject matter jurisdiction upon this court over plaintiffs' civil RICO action against the Nigeria defendants.

### c. The FSIA's Noncommercial Tort Exception

The Nigeria defendants next contend that plaintiffs' civil RICO claim is barred by § 1605(a)(5)(B) even if the conduct in question constitutes "commercial activity"

within the meaning of § 1605(a)(2). Section 1605(a)(5) states:

A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—

(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or (B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights;

28 U.S.C. § 1605(a)(5). The Nigeria defendants argue that subsection (a)(5)(B) serves as a double exception limiting not only § 1605(a)(5) but also § 1605(a)(2). They characterize the allegations of the complaint as accusations of misrepresentation and deceit. In their view, subsection (a)(5)(B) restores sovereign immunity as to all torts listed therein and, therefore, no viable claim for misrepresentation or deceit can ever proceed against a foreign state, even for acts that constitute commercial activity. I disagree.

Neither the Supreme Court nor the Tenth Circuit has explicitly decided whether subsection (a)(5)(B) applies to the "commercial activity" exception, § 1605(a)(2). Other courts have addressed this issue, reaching variant results. Most courts have held that subsection (a)(5)(B) does not restore sovereign immunity to a foreign sovereign when the conduct of the foreign sovereign also qualifies as commercial activity pursuant to § 1605(a)(2). *See Export Group v. Reef Industries, Inc.*, 54 F.3d 1466, 1473–1477 (9th Cir.1995); *see also Gilson v. Republic of Ireland*, 682 F.2d 1022, 1028 n. 27 (D.C.Cir. 1982); *Carnival Cruise Lines, Inc. v. Oy Wartsila Ab*, 159 B.R. 984, 1002 (S.D.Fla. 1993); *Foremost–McKesson Inc. v. Islamic Republic of Iran*, 759 F.Supp. 855, 859

(D.D.C.1991); *LeDonne v. Gulf Air, Inc.*, 700 F.Supp. 1400, 1410–1411 (E.D.Va.1988); *Tifa Ltd. v. Republic of Ghana*, 692 F.Supp. 393, 404 (D.N.J.1988); *United Euram Corp. v. Union of Soviet Socialist Republics*, 461 F.Supp. 609, 612 (S.D.N.Y.1978); *Yessenin–Volpin v. Novosti Press Agency*, 443 F.Supp. 849, 855 (S.D.N.Y.1978). Most of these Courts begin their analysis by noting that § 1605(a)(5) expressly states that its provisions apply to torts "not otherwise encompassed" by § 1605(a)(2). These Courts also rely on established canons of statutory construction. *See Export Group* at 1473–1474 (an exception is a limitation only upon the matter which directly precedes it) (citations omitted); *see also WMW Machinery, Inc. v. Werkzeugmaschinenhandel GmbH IM Aufbau*, 960 F.Supp. 734, 742 (S.D.N.Y.1997) (same). Hence, these Courts hold that § 1605(a)(5) provides an exception to sovereign immunity solely for "noncommercial torts." *See Amerada Hess*, 488 U.S. at 439 (referring to § 1605(a)(5) as the FSIA's "noncommercial torts exception").

Other courts have held that § 1605(a)(5) interacts with and limits the commercial exception of § 1605(a)(2). *See Gregorian v. Izvestia*, 658 F.Supp. 1224, 1233–1234 (C.D.Cal.1987), *aff'd*, 871 F.2d 1515 (9th Cir. 1989) (dismissed as dicta by another panel of the Ninth Circuit in *Export Group*); *Bryks v. Canadian Broadcasting Corp.*, 906 F.Supp. 204, 208–210 (S.D.N.Y.1995). These courts find the language of § 1605 ambiguous and look to the legislative history of the FSIA for guidance.

After reviewing these decisions and the authority on which they rely, I choose to follow *Export Group* and not *Bryks*. Unlike the Court in *Bryks*, I have no difficulty reconciling the language of § 1605(a)(2) and § 1605(a)(5)(B). Section 1605(a)(5) applies only to conduct "not otherwise encompassed in paragraph [(a)(2)]." Thus, subsection (a)(5)(B) does not apply to conduct that satisfies the commercial activity exception enumerated in § 1605(a)(2). Further, subsection (a)(5)(B) is preceded by the clause *"this paragraph* shall not apply to—. . . ." 28 U.S.C. § 1605(a)(5) (emphasis added). By its plain terms, the language of subsection

(a)(5)(B) limits only § 1605(a)(5) and does not affect § 1605(a)(2). I hold, therefore, that the noncommercial tort exception does not restore to the Nigeria defendants sovereign immunity.

### d. Acts "by" or "of" the Nigeria Defendants

The Nigeria defendants also contend that, even if the alleged conduct falls within the "commercial activity" exception, plaintiffs have not shown that the Nigeria defendants actually participated in such conduct. The FSIA's commercial exception provides an exception from sovereign immunity only for commercial activity "by" or "of" a foreign state. 28 U.S.C. § 1605(a)(2). Specifically, the Nigeria defendants contend that the Nigerians who defrauded plaintiffs falsely represented themselves as Nigerian officials. The Nigeria defendants argue that acts of third parties may be imputed to a foreign state only upon a factual showing that the third party acted as an agent or alter ego of the foreign state. This argument attacks the factual assertions of the complaint rather than its facial sufficiency. Thus, the court may make its own findings of fact. *Holt* at 1003.

In support of this argument, the Nigeria defendants attach signed declarations of three Nigerian officials: Victor Moore from CBN's Legal Department (Moore), Idenyemih Stella Omiyi of the Nigerian Ministry of Justice (Omiyi), and M.R. Rasheed, Director of CBN's Foreign Operations Department (Rasheed). In their declarations, Moore and Omiyi state that plaintiffs fell prey to an "advanced fee fraud" scam whereby private individuals in Nigeria impersonate employees of the Nigerian government. (Decl. of Moore at 1; Decl. of Omiyi at 2.) Moore and Omiyi state that neither CBN nor Nigeria authorize such scams or benefit from the fraudulently obtained money. Moore, Omiyi, and Rasheed state that the letters attached to plaintiffs' complaint are forgeries. (Decl. of Moore at 2; Decl. of Omiyi at 2; Decl. of Rasheed at 1.)

Moore states that the purported authors of the letters do not exist or are not known to him, with the exception of M.R. Rasheed, who Moore concedes is the director of CBN's Foreign Operations Department. (Decl. of Moore at 2.) Omiyi concedes that Major General Joe Garba is an actual person, but contends that he is not currently an official of the Nigerian government. (Decl. of Omiyi at 2.) Rasheed states that he never wrote any of the letters attached to plaintiffs' complaint. Rasheed claims that such letters are forgeries. (Decl. of Rasheed at 2.)

In opposition to the declarations of the Nigerian officials, plaintiffs offer the affidavit of Levi Martinez (Martinez), a paralegal and employee of plaintiff Losavio's law office. Martinez states that he contacted Rasheed several times after obtaining his direct telephone number from CBN's Nigerian office. Martinez states that he spoke to an individual who claimed to be Rasheed. Martinez also states that, during these conversations, the individual claiming to be Rasheed requested that Martinez transfer $25,000.00 to CBN in exchange for the release of $21,3000,000.00. (Aff. of Martinez at 1–4.)

In response to the Nigeria defendants' attack on the factual sufficiency of their complaint, plaintiffs request the opportunity to conduct limited discovery on the questions of agency and whether the Nigeria defendants actually participated in the alleged conduct. Plaintiffs request the opportunity to show that Rasheed and other Nigerian officials acted within the scope of their employment on behalf of Nigeria and CBN. This case involves people from two continents who have never met face to face. I afford, therefore, plaintiffs the opportunity to conduct discovery limited to the issue of whether the commercial activity was actually conducted by or for the Nigeria defendants. Pursuant to the order of reference to entered December 22, 1997, Magistrate Judge O. Edward Schlatter shall narrowly circumscribe discovery in accordance with the opinions expressed herein. Upon the completion of this limited discovery, the Nigeria defendants may renew their motion.

## V. ANALYSIS OF NIGERIA DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION.

Lastly, the Nigeria defendants move to dismiss plaintiffs' complaint for lack of per-

sonal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2). The Nigeria defendants argue that, as foreign sovereigns, they are nonresident defendants entitled to due process safeguards established by the United States Constitution. The Nigeria defendants contend that personal jurisdiction under the FSIA is determined by the minimum contacts test and that they lack minimum contacts with Colorado and the United States.

 Personal jurisdiction is proper under the Fifth Amendment if a nonresident defendant has "certain minimum contacts with [the forum] such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" International Shoe Co. v. State of Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). The minimum contacts standard may be satisfied in either of two ways. Trierweiler v. Croxton and Trench Holding Corp., 90 F.3d 1523, 1532 (10th Cir.1996). First, a court may exercise specific jurisdiction if a defendant purposely directs its activities at residents of the forum and the litigation results from alleged injuries that relate to those activities. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (citations omitted). Second, a court may exercise general jurisdiction where the defendant's contacts with the forum state, while not rising to the level of traditional notions of presence in the forum state, are "continuous and systematic." Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

 The FSIA, however, establishes a different paradigm for analyzing whether personal jurisdiction exists. The FSIA states in relevant part:

(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

(c) For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605–1607 of this title.

28 U.S.C. § 1330. The plain language of § 1330(b) states that personal jurisdiction exists in accordance with the FSIA when subject matter jurisdiction exists. See Shapiro v. Republic of Bolivia, 930 F.2d 1013, 1020 (2d Cir.1991) (personal jurisdiction equals subject matter jurisdiction plus valid service of process); but see Richmark Corp. v. Timber Falling Consultants, Inc., 937 F.2d 1444, 1446–1447 (9th Cir.1991), cert. denied, 506 U.S. 903, 113 S.Ct. 295, 121 L.Ed.2d 219 (1992).

 The minimum contacts test is inapplicable to foreign sovereigns because Congress intended courts to apply a more strict standard when exercising personal jurisdiction over a foreign sovereign. Shapiro at 1020. The FSIA defines "commercial activity carried on in the United States by a foreign state" as any commercial activity "carried on by such state and having substantial contact with the United States." 28 U.S.C. § 1603(e). Thus, the critical question is whether the particular conduct giving rise to plaintiffs' civil RICO claim is part of commercial activity having substantial contact with the United States. Shapiro at 1018. Contacts with the entire United States, as opposed to a particular state or forum, are relevant when applying the FSIA. Verlinden B.V., 461 U.S. at 490 (1983) (the FSIA is limited only by "some form of substantial contact with the United States."); accord Texas Trading, 647 F.2d at 314.

 Given this framework, the activities of the Nigeria defendants, as alleged in the complaint and exhibits attached to it, satisfy the "substantial contact" standard. First, the offer of contract assignment was published in the United States. Second, purported

officials of CBN and Nigeria communicated directly with individuals in the United States. Third, CBN and Nigeria allegedly used banking institutions in New York to transfer funds out of the United States. Lastly, the Nigeria defendants concede that CBN maintains banking accounts in New York. (Omiyi Decl. at 1–2.)

To the extent that due process considerations are subsumed into the substantial contacts analysis of the FSIA, I also conclude that the exercise of personal jurisdiction over the Nigeria defendants does not offend traditional notions of fair play and substantial justice. Though the Nigeria defendants may be inconvenienced by litigating in the United States, the inconvenience to the Nigeria defendants does not, by itself, present a violation of due process. Second, litigation in this forum was certainly foreseeable upon breach of the assignment agreement. *See, e.g., World Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Helicopteros Nacionales,* 466 U.S. at 414–415. Considering the substantial contacts to the United States, including but not limited to CBN's maintenance of a banking account in New York, it is apparent, therefore, that CBN regularly avails itself of the privileges of United States banking and financial laws. Finally, the United States has a strong interest in hearing this lawsuit. The FSIA represents an explicit Congressional intent to provide access to United States plaintiffs allegedly injured by the commercial actions of foreign sovereigns. *See Texas Trading,* 647 F.2d at 315; *see also Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivianos,* 712 F.Supp. 383, 390–392 (S.D.N.Y.1989).

## V. CONCLUSION

In summary, I conclude that: (1) the FSIA confers subject matter jurisdiction over plaintiffs' civil RICO claim against the Nigeria defendants; (2) the activities of the Nigeria defendants, as alleged in the complaint and evidenced by the exhibits attached to the complaint, constitute commercial activity as defined by §§ 1603 and 1605(a)(2) of the FSIA; (3) plaintiffs are afforded the opportunity to conduct limited discovery bearing on the issue of whether the commercial activity was actually conducted by, or on behalf of,

the Nigeria defendants; and (4) personal jurisdiction exists over the Nigeria defendants.

Accordingly, I ORDER that:

1) the Nigeria defendants' motion to dismiss for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1) is DENIED without prejudice as to whether the commercial activity was actually conducted by or for the Nigeria defendants and DENIED with prejudice as to all other issues;

2) plaintiffs are afforded the opportunity to conduct discovery limited to the issue of whether the commercial activity was actually conducted by or for the Nigeria defendants; defendants may renew their motion to dismiss for lack of subject matter jurisdiction on this narrow issue at the conclusion of such limited discovery;

3) the Nigeria defendants' motion to dismiss for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2) is DENIED; and

4) the Nigeria defendants' motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6), converted by the court to a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), is DENIED.